**STAMFORD BOARD OF EDUCATION, Appellant,**

v.

**STAMFORD EDUCATION ASSOCIATION, Stamford Federation of Teachers, Appellees.**

**No. 871, Docket 81–7590.**

United States Court of Appeals, Second Circuit.

Submitted Sept. 7, 1982.

Decided Dec. 27, 1982.

Martin A. Gould, Gould, Killian & Wynne, Hartford, Conn., for appellee, Stamford Educ. Ass'n.

John C. Bullock, Carmody & Torrance, Waterbury, Conn., for appellant, Stamford Bd. of Educ.

Marshall Goldberg, Stamford, Conn., for appellee, Stamford Federation of Teachers; Wofsey Rosen Kweskin & Kuriansky, David M. Cohen, Stamford, Conn., of counsel.

Before FEINBERG, Chief Judge, OAKES, Circuit Judge and CONNER,* District Judge.

FEINBERG, Chief Judge:

The Board of Education of Stamford, Connecticut (the Board) appeals from a judgment of the United States District Court for the District of Connecticut, T.F. Gilroy Daly, J., which denied the Board's motion for summary judgment on its cross-claims for indemnity against two labor unions, Stamford Education Association (SEA) and Stamford Federation of Teachers (SFT), and granted the cross-motions of the unions for summary judgment on the ground that the "hold harmless" clause of the labor contract between the parties is invalid as "patently contrary to federal civil rights policy." For reasons stated below, we affirm the judgment of the district court.

## I. Facts

This appeal has a muddled procedural history. In the summer of 1975, the Board entered into a two-year collective bargaining agreement (the Agreement) with the SEA, a labor union representing public school teachers in Stamford, establishing teachers' wages and benefits. In December 1975, SFT replaced SEA as the bargaining agent for the Stamford public school teachers and assumed the terms of the Agreement. One of the articles of the Agreement contained a pay schedule which apparently placed female coaches of extra-curricular sports at an economic disadvantage compared to their male counterparts. The same article of the Agreement provided that "[t]he SEA agrees to hold the Board harmless for any and all judgments, costs, and fees involved in defending any claim against the Board based on any claimed sex discrimination."[1]

In September 1977, after exhausting administrative remedies, Lynn Ryan and four other female coaches covered by the pay schedule, and their successor union, SFT, brought the present suit in federal district court alleging that the pay schedule discriminated on the basis of sex. They requested as relief, among other things, a declaratory judgment and an award of back pay as liquidated damages. Plaintiffs invoked various federal statutes as the basis of their suit, including Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and the Equal Pay Act, 29 U.S.C. §§ 206(d)(1)–(2).[2] The defendants in the suit included the Board, and its members, and SEA and its officers. Subsequently, SFT was realigned as a party defendant.

Early in 1978, the Board cross-claimed against both SEA and SFT on the basis of the "hold harmless" clause, seeking judgment against the two unions in the amount of any judgment there might be against the Board. The Board, SEA and SFT all moved for summary judgment on the issue of liability under the "hold harmless" clause. In June 1980, United States Magistrate Arthur H. Latimer ruled that the "hold harmless" clause violated federal civil rights policy, and denied the Board's motion for summary judgment on its cross-claim while granting the corresponding SEA and SFT motions for summary judgment. Judge Daly adopted the magistrate's ruling by endorsement dated July 9, 1980.

Over a year later, in July 1981, the judge approved a stipulation of settlement between the Board and the individual school teacher plaintiffs, and a consent judgment on plaintiffs' claims was entered. The Board then moved for entry of final judgment on all the claims in the case, and filed .

---

* Honorable William C. Conner, United States District Judge for the Southern District of New York, by designation.

1. Article 4B of the Agreement states:
B. Extra pay for extra-curricular activities shall be as set forth in Appendix "B" which is attached hereto and made a part of this Agreement. The SEA agrees to hold the Board harmless for any and all judgments, costs and fees involved in defending any claim against the Board based on any claimed sex discrimination.

2. In addition to the statutes mentioned in the text, plaintiffs alleged violations of other federal statutes, provisions of the federal constitution, and a Connecticut statute.

a protective appeal to this court. However, Judge Daly denied the Board's motion since he believed that the filing of the notice of appeal to this court rendered the motion "moot." In December 1981, we ordered the case remanded to the district court "for entry of an appropriate order." In January 1982, the judge entered the order described at the outset of this opinion; the Board thereafter again filed a notice of appeal. With the case now properly before us, we affirm the judgment of the district court, and hold that the "hold harmless" clause is void as against public policy.

## II. Jurisdiction

 While this appeal was pending for the second time, we asked the parties for supplementary letter briefs on the question whether the district court continued to have jurisdiction over the contractual cross-claims for indemnity, after the main federal claims of the plaintiffs had been settled before trial. Despite our initial concern on this issue, we now are convinced that the district court did continue to have ancillary, or incidental, jurisdiction over the cross-claims. See generally Note, A Closer Look at Pendent and Ancillary Jurisdiction: Toward a Theory of Incidental Jurisdiction, 95 Harv.L.Rev. 1935 (1982). Federal jurisdiction to hear a case like this must satisfy a two-prong test. First, there must be power to hear the state claim, which depends on whether it arises out of "a common nucleus of operative facts" as the main federal claim. Second, it is then within the federal court's sound discretion as to whether the policies of "judicial economy, convenience, and fairness to litigants" are furthered by the assumption of jurisdiction. See *United Mine Workers v. Gibbs*, 383 U.S. 715, 725–26, 86 S.Ct. 1130, 1138–1139, 16 L.Ed.2d 218 (1966).

We believe that the Board's cross-claim against the unions for indemnity meets both tests. The cross-claim does, in fact, arise out of the same common nucleus of operative facts as plaintiffs' main claims—the collective bargaining agreement, a portion of which formed the basis of the main sex discrimination claim—so that the case "would ordinarily be expected ... [to be tried] in one judicial proceeding." *United Mine Workers v. Gibbs*, supra, 383 U.S. at 725, 86 S.Ct. at 1138. We also believe that the policies bearing on the court's exercise of discretion to hear the indemnity claim are served by the retention of federal jurisdiction in this case. Both the parties and the district judge have already devoted a substantial amount of time to the issue of the legality of the "hold harmless" clause. It would neither be wise judicial administration nor fair to the parties to dismiss the indemnification claim now and force the parties to begin litigation of the cross-claim all over again in state court.[3] Moreover, there is a strong federal interest in the prevention of employment discrimination by reason of sex, see, e.g., Title VII, supra—an interest which is affected by contractual provisions which seek to adjust liability for discrimination. Finally, it is beyond dispute that the district court had jurisdiction over the incidental cross-claim when the magistrate and district judge found the "hold harmless" clause to be void, since the plaintiffs' main claims were then still before the district court. It is true that at the time there was no appealable order disposing of the cross-claim and that a final, appealable order was not entered until a year later. Nevertheless, it would be a hypertechnical construction of the doctrine of incidental jurisdiction to conclude that the district court had jurisdiction over

---

**3.** The unions cite *Federman v. Empire Fire & Ins. Co.*, 597 F.2d 798, 811 (2d Cir.1979), for the proposition that ancillary claims *must* be dismissed where the main federal claims have been settled prior to a trial. We note, however, that while couched in mandatory language, *Federman's* dismissal of the state claim fell under the discretionary prong as a "recommended procedure." Id. Cf. *Rosado v. Wyman*, 397 U.S. 397, 404–05, 90 S.Ct. 1207, 1213–

1214, 25 L.Ed.2d 442 (1970). Since we do not believe that *Federman* sets forth a new and inflexible rule which mandates automatic dismissal of all incidental claims following settlement or some subsequent event, see *Dery v. Wyer*, 265 F.2d 804, 808 (2d Cir.1959), we look to the policies underlying incidental jurisdiction to determine the existence of such jurisdiction in this case. See, e.g., *Koufakis v. Carvel*, 425 F.2d 892, 900 (2d Cir.1970).

the cross-claim when it decided the issue now before us, but lost it before the Board had an appropriate opportunity to appeal. We conclude, therefore, that the district court properly exercised jurisdiction over the cross-claim when it entered the final judgment from which the Board appeals.

### III. The "Hold Harmless" Clause

We now turn to the legality of the "hold harmless" clause. The sole issue before us on the merits is whether the "hold harmless" clause contained in the collective bargaining agreement is void as against public policy. Both Magistrate Latimer and Judge Daly found the clause to violate federal civil rights policy, and we affirm these holdings.

The term public policy is obviously a broad one; it embraces a multitude of virtues and sins. It is clear that public policy circumscribes agreements between private parties, see *Hurd v. Hodge,* 334 U.S. 24, 34–35, 68 S.Ct. 847, 852–853, 92 L.Ed. 1187 (1948), in order to prevent the courts from becoming "vehicles of discrimination." *Lee v. Habib,* 424 F.2d 891, 902 (D.C.Cir.1970). And collective bargaining agreements are not exempt from such scrutiny by the courts. See *Botany Industries, Inc. v. New York Joint Board,* 375 F.Supp. 485, 491 (S.D.N.Y.1974), vacated on other grounds sub nom. 506 F.2d 1246 (2d Cir.1974). While public policy is incapable of easy or precise definition, agreements which tend to injure the public good, as determined through consideration of constitutions, treaties, statutes and applicable legal precedent, see *Hurd v. Hodge,* supra, 334 U.S. at 35, 68 S.Ct. at 853, *Muschany v. United States,* 324 U.S. 49, 66, 65 S.Ct. 442, 451, 89 L.Ed. 744 (1945), will be found violative of public policy. Moreover, while violations of public policy must be determined through "definite indications in the law of the sovereignty," see *Muschany v. United States,* supra, 324 U.S. at 66, 65 S.Ct. at 451, courts must not be timid in voiding agreements which

tend to injure the public good or contravene some established interest of society, see *L'Orange v. Medical Protective Co.,* 394 F.2d 57, 60 (6th Cir.1968). See Gellhorn, Contracts and Public Policy, 35 Colum.L. Rev. 679, 686 (1935).

It is clear that there is a strong federal public policy against discrimination by reason of sex, see, e.g., U.S.Const. art. XIV; Title VII, 42 U.S. § 2000e et seq., The Equal Pay Act, 29 U.S.C. § 206(d). Thus, the question is whether the policies against discrimination embodied in these statutes will be undermined if the "hold harmless" clause at issue is enforced. The public policy goals of Title VII, for example,[4] are to deter discrimination by reason of sex and to compensate aggrieved persons for the injuries caused to them by reason of the discrimination. See *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 417–18, 95 S.Ct. 2371–2372, 45 L.Ed.2d 280 (1975). We believe that enforcement of the "hold harmless" clause here would work against both of these policies.

It is true that unions, as well as employers, are prohibited from discriminating against employees by reason of sex, see 42 U.S.C. §§ 2000e–2(a)(1) & (c)(3), and may be independently liable for discrimination, see generally Note, Union Liability for Employer Discrimination, 93 Harv.L.Rev. 702 (1980). In that sense, allowing the unions here to bear the full economic impact of the Board's settlement of the claims of the five individual plaintiffs does not conflict with that policy, particularly when, as here, SEA apparently actively sought the discriminatory pay provisions. Nevertheless, if the "hold harmless" clause is enforceable, employers will have little reason to be concerned over whether labor agreements discriminate against women, knowing full well that if they are later found to have discriminated, they will be totally compensated for any injuries resulting from the discrimi-

---

4. We note that Connecticut also has a policy of prohibiting discrimination by sex, see Fair Employment Practices Act, Conn.Gen.Stat. § 31–126 (current version at Conn.Gen.Stat. 46a–60 (West Supp.1982)), which has been characterized as "a segment of legislation designed to protect individuals because of their sex...." *Evening Sentinel v. National Organization for Women,* 168 Conn. 26, 357 A.2d 498, 503 (1975).

nation. Labor unions, on the other hand, will have little incentive to pursue anti-discrimination claims or lawsuits when they are aware that they will have to pay from their own pockets for the fruits of a victory. Cf. *Lachman v. Sperry-Sun Well Surveying Co.*, 457 F.2d 850, 854 (10th Cir.1974); see also *Professional Beauty Supply, Inc. v. National Beauty Supply, Inc.*, 594 F.2d 1179, 1186–87 (8th Cir.1979). This argument does not lose its force when a successor union to the contract, as SFT was here, is faced with this unpleasant choice.[5]

In addition, while plaintiffs will arguably be made whole regardless of whether the employer or the union pays, it is nevertheless true that if the union pays it may well be utilizing, at least in part, funds collected as dues from the plaintiffs themselves or from members of the plaintiff class. Cf. *Patterson v. American Tobacco Co.*, 535 F.2d 257, 270 (4th Cir.) cert. denied, 429 U.S. 920, 97 S.Ct. 314, 50 L.Ed.2d 286 (1976). The Board argues to us that the indemnity claim should be analogized to an insurance policy which, the Board asserts, would be legal, citing *Solo Cup Co. v. Federal Insurance Co.*, 619 F.2d 1178 (7th Cir.) cert. denied, 449 U.S. 1033, 101 S.Ct. 608, 66 L.Ed.2d 495 (1980) and *Union Camp Corp. v. Continental Gas Co.*, 452 F.Supp. 565 (S.D. Ga.1978). Putting to one side whether a policy insuring against the consequences of sex discrimination would actually be enforceable on these facts, see Willborn, Insurance, Public Policy, and Employment Discrimination, 66 Minn.L.Rev. 1003, 1028–29 (1982), indemnification presents a different issue. Insurance is protection against potential liability which is typically purchased through the paying of premiums. The possibility that premiums may be raised or coverage eliminated because of violations that lead to awards or settlements is a disincentive when a party is contracting for what appears to be a discriminatory agreement. In addition, the payment of premiums by a class of potential wrongdoers spreads the risk among the class, rather than shifting the entire cost onto one or two wrongdoers, which is precisely the effect of the indemnification clause at issue. See *Professional Beauty Supply, Inc. v. National Beauty Supply, Inc.*, supra, 594 F.2d at 1186 (approving of contribution, but not indemnification, for violations of federal antitrust law).[6]

Finally, this court has stated that a party may not indemnify himself against his own willful, reckless or criminal misconduct. *Globus v. Law Research Service, Inc.*, 418 F.2d 1276, 1288 (2d Cir.1969), cert. denied, 397 U.S. 913, 90 S.Ct. 913, 25 L.Ed.2d 93 (1970). While there was no finding below as to the relative intent of the parties to the contract, the logical reason why the contract contained a "hold harmless" clause was because at least one of the parties (probably, the Board) thought that there was a good chance that the pay schedule in the Agreement would be held discriminatory. This seems particularly true here since the "hold harmless" clause appears in the same article of the contract that incorporates the discriminatory pay schedule. To allow the Board to collect from the two unions would be to fully indemnify the Board for what is partly its own willful misconduct, the effect of which was the commission of a civil wrong against a third person or persons. See *Lachman v. Sperry-Sun Well Surveying Co.*, supra, 457 F.2d at 852. That the Board may have been pres-

---

5. We are aware that in the case now before us SFT, in fact, commendably risked liability by assisting the plaintiffs in their suit against the Board. See n. 7 infra. However, we believe that such behavior may be the exception and not the rule.

6. As noted above, *Professional Beauty Supply, Inc.* did approve of contribution in lieu of indemnification for violations of federal antitrust law. However, the Supreme Court has held that there is no common law or statutory right to contribution under Title VII or the Equal Pay Act. *Northwest Airlines v. Transport Workers Union of America*, 451 U.S. 77, 101 S.Ct. 1571, 67 L.Ed.2d 750 (1981). We take no position on the legality of a contractual contribution clause which shared, rather than shifted, liability. We also note that the record of this case reflects a cross-claim by SEA against SFT also on the basis of the "hold harmless" clause. Our holding that the "hold harmless" clause is invalid renders any discussion of this claim academic.

sured in accepting the offending pay schedule is not controlling in the absence of duress, which the Board did not allege. We do not at all suggest that the Board is more blameworthy than the unions. Clearly, it is not, as least compared to SEA.[7] But we are not faced with a claim for contribution, see note 6, supra, but with a claim for full indemnity. As to the latter, the decision of the district judge was correct.

We affirm the judgment of the district court.

---

**7.** SEA negotiated the offending provisions of the contract and agreed to hold the Board harmless. SFT, as successor union, after a certification election, was bound by the con-

tract. Nevertheless, it assisted the five individual plaintiffs in an effort to rectify the discrimination. When this failed, SFT joined them as plaintiffs in the law suit.