THOMAS JAMES ASSOCIATES, INC.;
Barbara S. Miller; Michelle K. Reichert;
Dave Kleber; Michael G. Gomez; and
James A. Villa, Plaintiffs–Appellants,

v.

Harry JAMESON, Defendant–Appellee.

No. 193, Docket 96–7004.

United States Court of Appeals,
Second Circuit.

Argued Sept. 27, 1996.

Decided Dec. 12, 1996.

Peter H. Abdella, Harter, Secrest & Emery, Rochester, NY (Robert L. Cholette, Harter, Secrest & Emery, Rochester, NY, of counsel), for Plaintiffs–Appellants.

Michael A. Oswald, Oswald & Yap, Irvine, CA, for Defendant–Appellee.

Before: WALKER, McLAUGHLIN and JACOBS, Circuit Judges.

McLAUGHLIN, Circuit Judge:

Thomas James Associates, Inc., and several of its employees (together, "TJA") appeal from a judgment of the United States District Court for the Western District of New York (Michael A. Telesca, *Judge*), granting Harry Jameson's motion for summary judgment and dismissing TJA's complaint in its declaratory judgment action. The effect of the dismissal is to allow Jameson's requested arbitration of his employment dispute with TJA to proceed before the National Associa-

tion of Securities Dealers (the "NASD"). For the reasons that follow, we affirm the district court's grant of summary judgment and dismissal of the complaint.

## BACKGROUND

The NASD is a self-regulatory association of securities firms, operating under the oversight of the federal Securities and Exchange Commission. The NASD enacts various codes, rules, and forms for its members. TJA is a securities firm and a member of the NASD.

In February, 1993, TJA hired Jameson as a broker in its Irvine, California office. As part of the employment process, Jameson executed a Uniform Application for Securities Industry Registration or Transfer, an industry-wide document universally known as "Form U–4." The application asked for detailed information about Jameson's employment and personal history. It also contained various general employment provisions to which, by his signature, Jameson agreed. One of these was an arbitration clause stating:

> I agree to arbitrate any dispute, claim or controversy that may arise between me and my firm, or a customer, or any other person, that is required to be arbitrated under the rules, constitutions or by-laws of the organizations with which I may register ... and that any arbitration award rendered against me may be entered as a judgment in any court of competent jurisdiction.

Through the Form U–4, Jameson also officially "registered" with the NASD. Accordingly, any "rules, constitutions [and] by-laws" of the NASD that require arbitration became binding on Jameson by his Form U–4's arbitration provision.

In practice, this meant that Jameson was bound by the NASD's Code of Arbitration (the "NASD Code"). At all relevant times the NASD Code § 8 ("§ 8")—entitled "Required Submission"—directed that:

> Any dispute, claim or controversy eligible for submission under part I of this Code between or among members and/or associated persons, and/or certain others, arising

in connection with the business of such member(s), or in connection with the activities of such associated person(s), shall be arbitrated under this Code, at the instance of: (1) a member against another member; (2) a member against a person associated with a member or a person associated with a member against a member; and (3) a person associated with a member against a person associated with a member.

The second line of § 8 refers to "part I of this Code." Part I, § 1 of the NASD Code (" § 1")—entitled "Matters Eligible for Submission"—provided for arbitration of:

> any dispute, claim or controversy arising out of or in connection with the business of any member of the [NASD], with the exception of disputes involving the insurance business of any member which is also an insurance company: (1) between or among members; (2) between or among members and public customers, or others; and (3) between or among members, registered clearing agencies with which the [NASD] has entered into an agreement to utilize the [NASD]'s arbitration facilities and procedures, and participants, pledgees or other persons using the facilities of a registered clearing agency, as these terms are defined under the rules of such a registered clearing agency.

The Form U–4 also contained a provision dealing with TJA's right to report to others Jameson's employment status and related information:

> I authorize all of my employers and any other person to furnish to any jurisdiction or organization or any agent acting on its behalf, any information they have including my creditworthiness, character, ability, business activities, educational background, general reputation, history of my employment and, in the case of former employers, complete reasons for my termination. Moreover, I release each employer, former employer and each other person from any and all liability of whatever nature, by reason of furnishing any of the above information, including that information reported on the Uniform Termination Notice for Securities Industry Registration (Form U–5).

On this sea of arbitration provisions is one piece of flotsam—Jameson also executed an Employment Agreement with TJA, which provided in part:

> The employee hereby waives all rights to arbitration which may be provided by any federal, state or self-regulatory organization rule or regulation for the resolution of any dispute arising out of this agreement or the termination thereof, including but not limited to NASD Manual—Code of Arbitration Procedure, Section 8.

Jameson started with TJA on March 1, 1993, and two months later he worked on a private placement debenture for a new venture called Christiana Capital Corporation ("Christiana"). Jameson submitted the proposal to TJA's "clearing house," Cowen & Company ("Cowen"), for review by its credit committee. Cowen notified TJA that the proposed offering was questionable—Christiana was apparently under investigation by the Federal Bureau of Investigation. TJA therefore instructed Jameson to drop the proposal and cease all contact with Christiana. According to TJA, Jameson ignored these instructions. TJA fired Jameson on August 3, 1993, for his alleged insubordination.

Industry standards require NASD-member firms to complete a Uniform Termination Notice for Securities Industry Registration, known as "Form U-5," when a registered representative ends his employment with a member firm for any reason. Barbara Miller, a TJA employee, completed Jameson's Form U-5, on which she wrote that Jameson was discharged for "failure to follow and abide by firm procedures and management's supervisory direction." Miller also indicated that Jameson was involved in a pending Securities and Exchange Commission ("SEC") investigation.

Following his termination, Jameson filed for unemployment insurance with the California Employment Development Department (the "CEDD"). The CEDD asked TJA the reason for Jameson's termination. Michelle Reichert, TJA's personnel director, informed the CEDD that Jameson had been fired for failing to follow TJA's explicit instructions.

Asserting that he had never contravened TJA's instructions, that he was never the subject of an SEC investigation, and that TJA's statements to the contrary—in both the Form U-5 and to the CEDD—were lies, Jameson filed a Statement of Claim with the NASD, requesting arbitration of an employment dispute against TJA and several of its employees. He sought an arbitration award including: an order that the "false statements" on the Form U-5 be stricken; money damages for lost income and injury to character; and attorney's fees.

TJA countered by filing a declaratory judgment action, pursuant to 28 U.S.C. § 2201, in the United States District Court for the Western District of New York. TJA sought a judicial determination that: (1) TJA is not required to arbitrate Jameson's claim, because the NASD Code does not provide for arbitration of employment-related disputes; (2) Jameson waived his right to arbitration in the Employment Agreement; (3) Miller and Reichert are not required to arbitrate Jameson's dispute; and (4) Jameson released TJA from any liability with respect to statements made in the Form U-5.

Jameson moved for summary judgment. TJA filed a cross-motion for summary judgment, asking the district court to stay the NASD arbitration. The court granted Jameson's motion, rejecting in turn TJA's first three arguments, and holding that the question whether Jameson released TJA from liability with respect to the Form U-5 should be determined by the arbitrators. The court therefore dismissed TJA's complaint in its entirety. The functional result of this judgment, of course, was to allow Jameson's requested arbitration before the NASD to go forward.

TJA now appeals, renewing its arguments raised below, and contending that the district court erred in all respects.

## DISCUSSION

I. *Arbitration of Employment–Related Disputes under the NASD Code*

▮ TJA argues that it cannot be required to arbitrate Jameson's claim because the

NASD Code does not provide for arbitration of employment-related disputes. We disagree, and find that a registered representative's employment-related claim against an NASD-member employer is arbitrable under the NASD Code.[1]

"Section 1 [of the NASD Code] defines the general universe of issues that *may* be arbitrated, and Section 8 describes a subset of that universe that *must* be arbitrated under the [NASD] Code." *Armijo v. Prudential Ins. Co. of Am.,* 72 F.3d 793, 798 (10th Cir. 1995). We begin with § 1, which, as mentioned above, provides for arbitration of any controversy:

> arising out of or in connection with the business of any member of the [NASD], with the exception of disputes involving the insurance business of any member which is also an insurance company: (1) between or among members; (2) between or among members and public customers, or others; and (3) between or among members [and] registered clearing agencies. . . .

Interpretation of this provision has been a judicial bane. In *Farrand v. Lutheran Brotherhood,* 993 F.2d 1253 (7th Cir.1993), the Seventh Circuit held that § 1's three subsections ((1)–(3)) qualified the phrase "arising out of or in connection with the business of any member of the [NASD]," *see id.* at 1254; that an employee suing a member-employer fell into none of these subsections (most particularly that such an employee was not an "other[ ]" within the meaning of § 1(2)), *see id.* at 1254–55; and that employment-related disputes were therefore not arbitrable, *see id.* at 1255.

In *Kidd v. Equitable Life Assurance Soc'y of the United States,* 32 F.3d 516 (11th Cir. 1994), the Eleventh Circuit disagreed and held that employment-related disputes are arbitrable. The Eleventh Circuit reasoned that § 1's three subsections applied, not back to that section's initial clause, but rather only to the adjoining "insurance exception" clause. *See id.* at 519. It therefore read § 1 to

"require[ ] arbitration for any dispute connected to an NASD member's business, except for disputes involving the insurance business of an NASD member that are (1) between NASD members or (2) between NASD members and public customers or others." *Id.* The court thus found that an employee's claim against a member-employer *is* arbitrable under § 1's unqualified (as the court read it) opening clause. *See id.* at 519 & n. 5.

The Tenth Circuit, in *Armijo,* added fuel to the fire. It rejected the Eleventh Circuit's reasoning that § 1's subsections applied only to the insurance exception clause; it agreed with the Seventh Circuit that the three subsections modified the initial clause. *See Armijo,* 72 F.3d at 798–99 n. 6. Contrary to *Farrand,* however, the court found that "others" in § 1(2) necessarily encompassed "associated persons" as used in § 8, and therefore included an aggrieved employee. *See id.* at 798–99. The court accordingly held that employment-related disputes are arbitrable, but not for the reason given by the Eleventh Circuit. *See id.* at 798.

█ We are inclined to agree with *Farrand* and *Armijo* that § 1's subsections apply to that section's opening clause, and not just to the insurance exception clause. We cannot fathom any possible reason why the NASD would except insurance business disputes from arbitration, but then only when those disputes involved certain parties. Rather, the NASD probably meant to exempt "*any* dispute involving the insurance business of an insurance company member from compulsory arbitration, not just those involving specific classes of individuals." *Pitter v. Prudential Life Ins. Co. of Am.,* 906 F.Supp. 130, 135 (E.D.N.Y.1995); *see also In re Prudential Ins. Co. of America Sales Practices Litig.,* 924 F.Supp. 627, 638–39, 640 (D.N.J.1996) (while the purpose of the insurance exception is unclear, "presumably it has something to do with the lack of insurance industry expertise on the part of securities

---

1. On October 1, 1993, the NASD amended the NASD Code to remove all doubt that employment-related disputes between an associated person (such as Jameson) and a member (such as TJA) are arbitrable. The parties disagree about the retroactive application of the amendment to this case. Because we conclude that the NASD Code provided for arbitration of employment disputes even before the amendment, we do not reach this issue.

industry arbitrators"). To put it in the language of a grammarian, we therefore interpret the insurance exception clause as something "more akin to a parenthetical within the section rather than an independent clause modified by the language following the colon." *Pitter*, 906 F.Supp. at 135; *see also In re Prudential Ins. Co.*, 924 F.Supp. at 638–40.

This brings us to the meaning of § 1(2): does "others" include an employee who has an employment-related dispute with a member firm? We answer this question by turning to several well-worn maxims of federal arbitration law.

■■■ Jameson's Form U–4 is a contract,[2] and interpretation of its arbitration clause is governed by the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* ("FAA"). *See Williams v. Cigna Fin. Advisors, Inc.*, 56 F.3d 656, 659–60 (5th Cir.1995); *Fletcher v. Kidder, Peabody & Co.*, 81 N.Y.2d 623, 601 N.Y.S.2d 686, 689, 619 N.E.2d 998, 1001 , *cert. denied*, 510 U.S. 993, 114 S.Ct. 554, 126 L.Ed.2d 455 (1993); *see generally Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24–26, 111 S.Ct. 1647, 1651–52, 114 L.Ed.2d 26 (1991) (discussing history, purpose, and application of the FAA). It is important to note that the FAA embodies "a strong federal policy favoring arbitration." *New York v. Oneida Indian Nation*, 90 F.3d 58, 61 (2d Cir.1996). "In accordance with that policy, we resolve doubts as to the arbitrability of a claim in favor of arbitrability." *Oneida Indian Nation*, 90 F.3d at 61 (citing *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983)). Thus, arbitration must be preferred "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *David L. Threlkeld & Co. v. Metallgesellschaft Ltd.*, 923 F.2d 245, 250 (2d Cir.) (internal quotations and citation omitted), *cert. dismissed*, 501 U.S. 1267, 112 S.Ct. 17, 115 L.Ed.2d 1094 (1991).

■■ Because we cannot say "with positive assurance" that "others" does not include an employee with an employment-related dispute against a member firm, we hold that it does. Several considerations steer us to this conclusion.

First, to hold otherwise would drive an awkward wedge between § 1 and § 8. *See Armijo*, 72 F.3d at 798–99; *Kidd*, 32 F.3d at 519–20. Unless he qualifies as an "other[ ]" under § 1(2), it is plain that Jameson does not fall into any category within § 1's subsections. And, on the other hand, § 8 clearly contemplates that Jameson, as an "associated person," will arbitrate his disputes with an NASD-member employer. If we were to read "others" to exclude Jameson, § 1 would take what § 8 gives, rendering § 8 utterly superfluous in this respect. Therefore, to avoid construing one provision as negating the other, "we must give Section 1 an interpretation at least as broad as that clearly called for in Section 8." *Armijo*, 72 F.3d at 799.

Furthermore, if we were to exclude Jameson from "others" it would eviscerate the language of his Form U–4, which clearly states that he agrees to arbitrate disputes between himself and his firm, where required by the NASD Code. As the Tenth Circuit observed:

> That language clearly indicates that the parties believed, and intended, that at least certain disputes between [TJA] and [Jameson] would be arbitrated. Unless the word "others" in Section 1(2) of the NASD Code is broadly interpreted to include [Jameson, his] explicit agreement[ ] in Form U–4 would be a nullity.

*Id.*

Finally, we note that the NASD itself indicated as early as 1987 that the NASD Code applied to employment-related disputes between employees and member firms. *See id.* (citing 52 Fed.Reg. 9232 (1987)); *Kidd*, 32 F.3d at 520; *see also Association of Inv. Brokers v. Securities and Exch. Comm'n*, 676

---

2. Jameson is bound by the Form U–4 because his signature manifests his assent. TJA is bound by the Form U–4's provisions, including the arbitration provision, because of its membership in the NASD. *See Kidder, Peabody & Co. v. Zinsmeyer Trusts Partnership*, 41 F.3d 861, 863 (2d Cir. 1994); *Roney & Co. v. Goren*, 875 F.2d 1218, 1222 (6th Cir.1989).

F.2d 857, 861 (D.C.Cir.1982) ("NASD rules mandate arbitration of employer-employee disputes"). Indeed, when the NASD amended the NASD Code in 1993 to state expressly that employment-related disputes are arbitrable, *see* note 1 (above), it explained that the amendments were not substantive, but intended only to "clear up any ambiguity." 58 Fed.Reg. 39071; *see Armijo,* 72 F.3d at 799–800; *Farrand,* 993 F.2d at 1256 (per curiam, denying petition for rehearing).

We recognize that these NASD statements were not made contemporaneously with the adoption of the NASD Code, and therefore are subject to some discount. *See Farrand,* 993 F.2d at 1255 (per curiam, denying petition for rehearing). If the language of the NASD Code were clear, and these statements contradicted that language, we would surely dismiss them as "wishful thinking." *Id.* at 1256. But the NASD Code is at best ambiguous. *See Armijo,* 72 F.3d at 798; *Kidd,* 32 F.3d at 519 n. 6.

■ Thus, we hold that TJA is required by the NASD Code to arbitrate Jameson's dispute.

## II. *Jameson's Waiver of Arbitration in the Employment Agreement*

TJA next argues that Jameson waived his right to arbitration in the Employment Agreement. While Jameson's Employment Agreement does contain a provision waiving arbitration, we find this provision void as against public policy.

■ "The term public policy is obviously a broad one; it embraces a multitude of virtues and sins." *Stamford Bd. of Educ. v. Stamford Educ. Ass'n,* 697 F.2d 70, 73 (2d Cir. 1982). Federal "public policy" is typically found in the Constitution, treaties, federal statutes and regulations, and court cases. *See id.* (citing *Hurd v. Hodge,* 334 U.S. 24, 35, 68 S.Ct. 847, 853, 92 L.Ed. 1187 (1948), and *Muschany v. United States,* 324 U.S. 49, 66, 65 S.Ct. 442, 451, 89 L.Ed. 744 (1945)). And:

> while violations of public policy must be determined through definite indications in the law of the sovereignty, courts must not be timid in voiding agreements which tend

to injure the public good or contravene some established interest of society.

*Stamford Bd. of Educ.,* 697 F.2d at 73 (internal quotations and citation omitted).

■ As stated above, the FAA represents "a strong federal policy favoring arbitration." *Oneida Indian Nation,* 90 F.3d at 61. Standing alone, this policy may not suffice to void an employee's knowing, explicit waiver of arbitration rights. *See Cabinetree of Wisconsin, Inc. v. Kraftmaid Cabinetry, Inc.,* 50 F.3d 388, 390 (7th Cir.1995) ("the federal policy favoring arbitration is, at least so far as concerns the interpretation of an arbitration clause, merely a policy of treating such clauses no less hospitably than other contractual provisions"). But, in this case, we are presented with a much more specific indication of federal policy: in 1987, the NASD adopted a resolution, approved by the SEC, stating that:

> It has come to the NASD's attention that certain broker/dealers have been including in their agreements with registered representatives language that purports to waive the representative's right to obtain arbitration of any disputes arising out of the agreement.... This ... conflicts with the NASD's Code of Arbitration Procedure, which requires industry disputes to be arbitrated at the instance of either party.

52 Fed.Reg. 9232 (1987). The NASD therewith provided that:

> it shall be considered conduct inconsistent with just and equitable principles of trade and a violation of Article III, section 1 of the NASD's Rules of Fair Practice for a member to require its associated persons to waive the arbitration of disputes arising out of their association with the member.

*Id.*

■ When a self-regulatory association of securities firms, under direct federal supervision, ordains that its members may not require their employees to waive arbitration rights, it would be inappropriate for us to enforce such a waiver. *See F.N. Wolf & Co. v. Bowles,* 160 Misc.2d 752, 610 N.Y.S.2d 757, 761 (N.Y.Sup.Ct.1994).

TJA argues that Jameson's waiver of his right to arbitrate in the Employment Agree-

ment does not violate public policy because: (1) there was no right to arbitrate employment-related disputes before the 1993 amendments to the NASD Code; and (2) parties generally have the ability to contract their way around industry-wide regulations. *See F.N. Wolf & Co. v. Brothers,* 161 Misc.2d 98, 613 N.Y.S.2d 319, 322 (N.Y.Sup.Ct.1994). In light of our discussion in Part I (above), TJA's first argument is without merit—the NASD Code provided for arbitration of employment-related disputes prior to the 1993 amendments. And, TJA's second argument begs the question we must answer; if a waiver is contrary to public policy (as we find it is), then the parties may *not* contract for a waiver.

■ We therefore hold that the arbitration waiver provision in the TJA–Jameson Employment Agreement violates public policy, and is unenforceable.

### III. *Miller's and Reichert's Obligation to Arbitrate*

TJA also contends that Miller and Reichert cannot be required to arbitrate Jameson's dispute. Again, we disagree.

As previously mentioned, § 8 "addresses which disputes are required to be arbitrated." *Armijo,* 72 F.3d at 796. That section imposes two conditions on compulsory arbitration under the NASD Code:

> The first is a restriction on the parties: the dispute must be "between or among members and/or associated persons, and/or certain others." The second is a restriction on the subject matter: the substantive disputes must be ones "arising in connection with the business" of members or arising "in connection with the activities of such associated person(s)."

*McMahan Sec. Co. v. Forum Capital Mkts. L.P.,* 35 F.3d 82, 86 (2d Cir.1994).

To require Miller and Reichert to arbitrate, then, we must find them to be either "associated persons," or "certain others." Under the NASD By–Laws, an "associated person" is any:

> sole proprietor, partner, officer, director, or branch manager of any member, or any natural person occupying a similar status

or performing similar functions, or any natural person engaged in the investment banking or securities business who is directly or indirectly controlling or controlled by such member. . . .

Taking a slightly broader approach, the Securities Exchange Act of 1934, *see* 15 U.S.C. § 78a *et seq.* ("SEA")—"the authority for an individual exchange's self-regulating rules," *see Kaplan v. First Options of Chicago, Inc.,* 19 F.3d 1503, 1517 (3d Cir.1994) (citing 15 U.S.C. §§ 78f(b), 78o–3(b)(8), 78s(g)(1)), *aff'd,* —— U.S. ——, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995)—defines "associated person" to include an "employee of . . . [a] member," 15 U.S.C. § 78c(a)(21). Neither the SEA nor the NASD By–Laws define "certain others." *See id.; McMahan,* 35 F.3d at 87.

Under the SEA definition of "associated persons," which includes "employees" of a member, both Miller and Reichert obviously qualify. But, under the NASD By–Laws' definition—which does not include "employees"—their status as "associated persons" would likely turn on a highly factual evaluation of their managerial capacity. And, it is debatable which definition controls—the NASD By–Laws or the SEA. *See, e.g., Fleck v. E.F. Hutton Group, Inc.,* 891 F.2d 1047, 1054 & n. 4 (2d Cir.1989); *Tays v. Covenant Life Ins. Co.,* 964 F.2d 501, 502–03 (5th Cir.1992) (per curiam); *Chisolm v. Kidder, Peabody Asset Management Inc.,* 810 F.Supp. 479, 480–81 n. 2 (S.D.N.Y.1992); *Slade v. Metropolitan Life Ins. Co.,* 647 N.Y.S.2d 504, 505 (N.Y.App.Div.1996).

■ We need not enter into this debate, however, because we find that both Miller and Reichert are, at a minimum, "certain others" within the meaning of § 8. In *McMahan,* we found a party:

> sufficiently immersed in the underlying controversy for it to be considered a "certain other[ ]" party under § 8(a). A person who is neither a member nor an associated person is nevertheless appropriately joined in the arbitration where that party plays an active role in the securities industry, is a signatory to a securities-industry arbitration agreement (or is an instrument of another party to the arbitration), and

has voluntarily participated in the particular events giving rise to the controversy underlying the arbitration.

*McMahan*, 35 F.3d at 87–88.

Miller and Reichert are both TJA employees, and are therefore "closely affiliated with [a party] enmeshed in the underlying dispute." *Id.* at 88. While there is no indication that either of them has executed an arbitration agreement, both are "instruments" of TJA, inasmuch as they actually published the allegedly defamatory statements under TJA's name—and TJA is a party to the arbitration. Furthermore, because Miller completed Jameson's Form U–5, and Reichert responded to the CEDD's inquiry, both "voluntarily participated in the particular events giving rise to" Jameson's claim. *Id.*

Guided by the polestar of the "strong federal policy favoring arbitration," *Oneida Indian Nation*, 90 F.3d at 61, we find that "[t]he cumulation of all these circumstances" make Miller and Reichert "proper part[ies] to arbitration under the NASD Code," *McMahan*, 35 F.3d at 88.

### IV. *Jameson's Release of Liability for Form U–5 Statements*

Finally, TJA argues that Jameson released TJA from any liability with respect to statements made in the Form U–5. We find that this question should be resolved by the arbitrators.

"Once a court determines that the parties agreed to arbitrate a dispute, then that dispute must be submitted to the arbitrator." *Local Union No. 370 of the Int'l Union of Operating Eng'rs v. Morrison-Knudsen Co.*, 786 F.2d 1356, 1358 (9th Cir. 1986) (citing *International Union of Operating Eng'rs v. Flair Builders*, 406 U.S. 487, 491–92, 92 S.Ct. 1710, 1713, 32 L.Ed.2d 248 (1972)); *see also John Wiley and Sons v. Livingston*, 376 U.S. 543, 557, 84 S.Ct. 909, 918, 11 L.Ed.2d 898 (1964). This includes questions of affirmative defenses to the claim, such as estoppel or waiver. *See Local Union No. 370*, 786 F.2d at 1358 (and cases cited therein).

Here, the Jameson–TJA dispute is arbitrable. *See* Part I (above); *see also Fleck*, 891 F.2d at 1052–53 (defamation claims are arbitrable). We therefore leave TJA's assertion of a waiver defense, based on Jameson's Form U–4 (and its reference to Form U–5), to the arbitrators.

TJA argues that the scope of the waiver provision is a matter for the court to determine, relying on *Peerless Importers, Inc. v. Wine, Liquor & Distillery Workers Union Local One*, 903 F.2d 924 (2d Cir.1990). In that case, we stated:

> Where an agreement to arbitrate concerns disputes arising in the course of an ongoing relationship, a settlement of a single dispute does not terminate the agreement to arbitrate, and the validity of such a settlement is properly a matter for the arbitrator to consider as an affirmative defense to the grievance. But where ... the agreement to arbitrate concerns only a single dispute ... the agreement to settle the dispute is fairly viewed as a [collateral] agreement not to arbitrate the dispute. The validity of that agreement ... is an issue for the court.

*Id.* at 929. Because the release in *Peerless* was a settlement of a single claim, made subsequent to a narrow oral agreement to arbitrate that claim (which was not covered by the parties' written arbitration clause), we found that the release was a "collateral" agreement not to arbitrate, and that the effect of such agreement was an issue for the court. *Id.* at 929–30; *see also Rochdale Village, Inc. v. Public Serv. Employees Union Local No. 80*, 605 F.2d 1290, 1296–97 (2d Cir.1979).

Here, we are faced with a much different "release." The release in Jameson's Form U–4 is part of the same document that contains a broad arbitration clause. That arbitration clause covers not a single dispute, but any dispute "arising in the course of [Jameson's and TJA's] ongoing relationship." *Peerless Importers*, 903 F.2d at 929. Thus, the waiver should be considered as an affirmative defense to Jameson's claim, and its effect is a matter for the arbitrators.

## CONCLUSION

In sum, we hold that: (1) Jameson's claim against TJA is arbitrable under the NASD Code; (2) his waiver of arbitration in the Employment Agreement violates public policy, and is unenforceable; (3) Miller and Reichert are required to arbitrate Jameson's dispute; and (4) the question of Jameson's release with respect to statements made in the Form U–5 is a matter for the arbitrators.

We have considered all of TJA's arguments, and find them without merit. Accordingly, the judgment of the district court is AFFIRMED.