**ESSEX CORPORATION, Plaintiff,**

v.

**INDEPENDENT FINANCIAL MARKET-ING GROUP, INC., John Harrell, and Lori Young, Defendants.**

No. 97 Civ. 3850(HB).

United States District Court, S.D. New York.

Feb. 23, 1998.

David Rabinowitz, Moses & Singer L.L.P., New York, for Plaintiff.

Thomas M. Campbell, Smith Campbell & Paduano, New York, for Defendants.

### *OPINION AND ORDER*

BAER, District Judge.

Defendants Independent Financial Marketing Group, Inc. ("Independent"), John Harrell and Lori Young move to compel arbitration of Plaintiff Essex Corporation's ("Essex") claims.[1] For the reasons stated below, the motion to compel arbitration is granted and the action stayed.

### I. Background

The Plaintiff, Essex, is a New York Corporation that markets annuities, investment, and insurance products to banks and their customers. The Defendant, Independent, is a competitor of Essex in the bank insurance and investment industry. Defendants John Harrell and Lori Young are former Essex employees who currently work for Independent. In their amended complaint dated June 2, 1997, Essex advances the following nine claims: (1) against Independent, for copyright infringement; (2) against Young, for copyright infringement; (3) against Harrell, for breaching his confidentiality agreement with Essex by disclosing confidential business information to Independent; (4)

against Harrell, for breaching his restrictive covenant by assisting Independent in their efforts to attract one of Essex's clients; (5) against Harrell and Young, for violating the duty of fidelity owed to Essex; (6) against Independent, for wrongfully inducing Harrell to breach his agreement with Essex; (7) against Independent, for wrongfully inducing and conspiring with Harrell and Young to violate their fiduciary duties to Essex; (8) against Independent, for making false representations concerning its services; and (9) against Independent, for trademark violations and unfair competition. Compl. ¶¶ 42–62. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338 and 1367, as well as 15 U.S.C. § 1121.

John Harrell worked for Essex from 1990 until 1996 and Lori Young from 1993 to 1994. As employees of Essex, their principal responsibilities included: (1) the sale of annuities, including variable annuities, which involved investment in securities; and (2) the training of others to sell annuities, including instruction in compliance with securities law. Harrell Decl. ¶ 4; Young Decl. ¶ 4. These activities required that Harrell and Young be licensed and registered with a member of the National Association of Securities Dealers ("NASD"). Essex is not a NASD member. Consequently, Harrell and Young obtained their license and registration through Essex National Securities, Inc. ("ENSI"), a NASD-member and wholly-owned subsidiary of Essex. Harrell Decl. ¶¶ 4–6; Young Decl. ¶¶ 4–6. At all times, however, Harrell and Young were officially Essex employees.

ENSI performs three functions for Essex. First, sales representatives of Essex's customer banks, who require NASD licensing, register with NASD through ENSI. Once these employees have obtained their license, they can sell NASD-registered products. Second, ENSI supervises these employees to insure compliance with NASD rules. Finally, payments received for NASD-registered

---

1. Alternatively, the Defendants ask the Court to exercise its discretion and dismiss the Plaintiff's amended complaint in light of a National Association of Securities Dealers ("NASD") arbitration agreement, which they contend is binding on Essex. *See, e.g., Lombard Securities Inc. v. Thomas F. White & Co., Inc.*, 903 F.Supp. 895,

900 (D.Md.1995) (dismissing action, pursuant to the Court's inherent authority to achieve the orderly and expeditious disposition of cases, given binding NASD arbitration agreement). Rather than dismiss the amended complaint, however, the appropriate remedy is a stay pending arbitration.

products are deposited with ENSI, who send them to the investment company providing the product. The investment company then pays ENSI a percentage of each sale. Nicholas Aff. ¶ 6. Between January 1, 1993 and January 1, 1997 Essex sold $11.3 billion in financial products. During this period, approximately 16% of Essex's total revenue, or $1.8 billion, can be attributed to ENSI. Nicholas Aff. ¶¶ 9, 11.

As registered representatives of ENSI, Harrell and Young signed a Uniform Application for Securities Industry Registration ("Form U–4"). Harrell Decl. ¶ 7; Young Decl. ¶ 7. The Form U–4 states that the representative agrees to "arbitrate any dispute, claim or controversy that may arise between me and my firm, or a customer, or any other person, that is required to be arbitrated under the rules, constitutions, or by-laws [of NASD]." Stechman Aff., Ex. 1.

Essentially, Essex's claims are all related to one marketing strategy and two sets of documents, which they claim were wrongfully appropriated and used by Independent with the assistance of Harrell and Young. The first set of documents are called "Essex Black Pieces," which consist of charts, graphs, tables and text providing financial information and analysis concerning investment and historical trends in the securities industry. These documents are called Black Pieces because of their distinctive black background. They are used as sales tools by representatives selling Essex products. Essex owns the copyrights to these Black Pieces, but these documents are created by ENSI.

The other set of documents relevant to this litigation are a series of informational publications called "Your Money Matters." These publications are distributed to prospective customers by Essex sales representatives. Particularly relevant here, is a document entitled "Your Money Matters—Investment Pyramid," which ranks various forms of securities according to risk and potential for fi-

nancial return. As with the Black Pieces, Essex owns the copyrights to the "Your Money Matters" informational publications, but ENSI created these documents.

Finally, Essex's system of presenting financial products to potential customers—called "hybrid program marketing"—is central to this action. According to Essex, most companies in the bank insurance and investment industry market their products through full-time employees, or by providing marketing support to branch bank employees who sell financial products on a part-time basis. Conversely, through hybrid program marketing, Essex utilizes both full-time employees of the bank or marketing company and part-time employees of the branch bank. Accompanying this program is a hybrid methodology, encompassing employee training and compensation, marketing and sales materials, techniques and strategies, and a system for implementing and sustaining the hybrid program. Essex contends that the hybrid program methodology is a valuable trade secret which Defendant Harrell agreed to maintain in strict confidence.[2] Compl. ¶¶ 15, 25.

As stated earlier, both Harrell and Young are now employed by Independent. At Independent, Harrell and Young are involved in the marketing of variable annuities, and are therefore required to have securities licenses. Since Independent is not a member of NASD, Harrell and Young were licensed through Liberty Securities Corp. ("Liberty"), a NASD member wholly-owned by the entity that wholly-owns Independent.

## II. Discussion

Form U–4, the agreement signed by Harrell and Young when employed by Essex, is a contract. Consequently, § 9 of the Federal Arbitration Act ("FAA") governs the interpretation of the arbitration provision contained in this agreement. *See Thomas James Associates, Inc. v. Jameson*, 102 F.3d 60, 65 (2d Cir.1996). Pursuant to § 3 of the FAA, a district court must stay proceedings

---

**2.** Harrell executed a written contract with Essex where he agreed "not [to] disclose or use any confidential or secret information relating to the Corporation." This contract also provided that, for a period of three years after concluding his employment with Essex, he would not "directly

or indirectly ... [p]ersuade or attempt to persuade any potential client or customer [of Essex] ... not to engage the Corporation or to engage another supplier of products and services" such as those offered by Essex. Compl. ¶ 26–27.

if satisfied that the parties have agreed in writing to arbitrate an issue in the litigation. *See McMahan Securities Co. L.P. v. Forum Capital Markets L.P.*, 35 F.3d 82, 85 (2d Cir.1994) [hereinafter *McMahan* ].

■ The FAA embodies a strong federal policy favoring arbitration. *See Thomas James Associates*, 102 F.3d at 65. Consistent with this policy, all doubts as to the scope of issues eligible for arbitration must be resolved in favor of arbitrability. *See McMahan*, 35 F.3d at 86 (citing *Moses H. Cone Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983)). Arbitration is preferred "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Thomas James Associates*, 102 F.3d at 65 (quoting *David L. Threlkeld & Co. v. Metallgesellschaft*, 923 F.2d 245, 250 (2d Cir.), *cert. dismissed*, 501 U.S. 1267, 112 S.Ct. 17, 115 L.Ed.2d 1094 (1991)). Of course, this preference for arbitration is tempered by the Supreme Court's admonition that "the FAA does not require parties to arbitrate when they have not agreed" to resolve their dispute in that fashion. *Volt Info. Sciences Inc. v. Board of Trustees*, 489 U.S. 468, 478, 109 S.Ct. 1248, 1255, 103 L.Ed.2d 488 (1989).

The arbitrability of this dispute turns on whether the relevant NASD requirements have been satisfied. Those requirements are found in Rule 10101 of the NASD Code of Arbitration Procedure ("NASD Code").[3] Rule 10101 sets forth the "matters eligible for submission" to arbitration. First, only disputes between or among members, associated persons or certain "others" may be arbitrated. Second, a party can arbitrate only those issues either "arising out of or in connection with the business of any member of the Association ... with the exception of disputes involving the insurance business of any member which is also an insurance company." If both NASD Code requirements are satisfied, the Court must compel arbitration.

## A. Are the Parties Subject to Arbitration?

■ Essex contends that compelling arbitration would be improper since neither it nor Independent, as corporate entities, fall within the NASD Code's definition of an "associated person." Rather, according to Essex, the definition of an "associated person" requires that the party be a human being. Indeed, the NASD By–Laws limit the term "associated person" to natural persons.[4] The analysis, however, does not end with the NASD By–Laws. As Independent points out, several courts have read § 3(a)(21) of the 1934 Securities Exchange Act ("1934 SEA") as providing a superceding definition of an "associated person."[5] *See, e.g., Cular v. Metropolitan Life Insurance Co.*, 961 F.Supp. 550, 556 (S.D.N.Y.1997); *Chisolm v. Kidder, Peabody Asset Management, Inc.*, 810 F.Supp. 479, 481 n. 2 (S.D.N.Y.1992); *but see Gaghich v. Prudential Insurance Co. of America*, 1997 WL 128269 (W.D.N.Y. March 10, 1997) (holding that NASD definition of associated person should govern whenever NASD By–Laws and rules are applied).

The 1934 SEA defines an associated person as one "directly or indirectly controlling, controlled by, or under common control with such member [of NASD]...." 15 U.S.C. § 78c(a)(21). The NASD was established

---

**3.** The NASD Code is prescribed and adopted pursuant to Article VII, § 1(a)(3) of the NASD By-laws. *See* National Association of Securities Dealers, Inc. Manuel, Article VII, § 1(a)(3) (July 1996).

**4.** The NASD By–Laws set forth the following definition: the term "person associated with a member" or "associated person of a member" means every sole proprietor, partner, officer, director, or branch manager of any member, or any **natural person** engaged in the investment banking or securities business who is directly or indirectly controlling or controlled by such member, whether or not any such person is registered or exempt from registration with the [NASD] pursuant to these By–Laws. *See* National Association of Securities Dealers, Inc., NASD Manuel By–Laws, Art. I, § (q) (July 1996).

**5.** To date, the Second Circuit has not decided whether the 1934 SEA trumps the NASD By–Laws. *See Thomas James Associates*, 102 F.3d at 67 (declining to enter debate as to which definition—the NASD By–Laws or the Securities Exchange Act—controls).

pursuant to, and derives its authority from, the Securities Exchange Act. Logically, then, the 1934 SEA should govern when there is a conflict between this Act and the NASD By–Laws. After all, it would be an anomalous result if a creature of the SEA could foreclose certain parties from arbitrating a securities-related dispute, even though arbitration would be possible under the SEA definition.[6]

ENSI is a wholly-owned subsidiary of Essex. Essex, therefore, as one who "directly or indirectly controls" ENSI, a NASD-member, is an associated person. Similarly, Independent falls within the 1934 SEA definition of an associated person because it is "under common control" with Liberty, a NASD-member wholly-owned by the entity that wholly owns Independent. *See McCowan v. Sears, Roebuck and Co.*, 908 F.2d 1099, 1107 (2d Cir.1990) (compelling arbitration where claims were brought against brokerage firm and its non-NASD member "controlling person," on the basis of arbitration agreement between plaintiffs and brokerage firm, notwithstanding fact that no judgement was sought against the brokerage firm). Thus, as associated persons, Essex and Independent are both subject to the arbitration provision in the Form U–4 signed by Harrell and Young.

**6.** There is a reasonable argument that even the NASD By–Laws do not require an "associated person" to be a human being. *See McMahan*, 35 F.3d at 87–88. In *McMahan*, the Second Circuit noted that the NASD *Rules of Fair Practice*, promulgated pursuant to the same authority as the NASD Code of Arbitration, define "person" to include partnership, corporation, association, or other legal entity. *Id.* According to the Second Circuit, this broader definition bolstered their conclusion that "the NASD By–Laws do not invariably require an 'associated person' to be a natural person." *Id.* at 88.

**7.** The insurance business exception, mentioned earlier, is not applicable since Essex has not alleged that the Defendants engaged in unlawful insurance practices. *See Wojcik v. Aetna Life Ins. And Annuity Co.*, 901 F.Supp. 1282, 1292 (N.D.Ill.1995).

**8.** Essex also argues that, to be arbitrable, its claims must pertain to the NASD-related business of ENSI. Essex concedes that there is no direct authority imposing a "relatedness" requirement in a NASD arbitration. Not to be

## B. Are the Claims Subject to Arbitration?

■ Rule 10101 permits "arbitration of any dispute, claim, or controversy arising out of or in connection with the business of any member of the Association."[7] Consequently, Essex's claims are subject to arbitration if this Court concludes that they arise out of or are connected with the business of ENSI.[8]

### 1. Essex Black Pieces and "Your Money Matters" Publications

■ The Plaintiff's amended complaint advances nine claims. Seven of those claims directly involve the alleged misappropriation and wrongful use of Essex Black Pieces and "Your Money Matters" publications.[9] Claims one and two assert that Independent and Young infringed on the copyrights Essex owns in the Black Pieces. Compl. ¶¶ 42–46. According to the amended complaint, in or about June 1994 Independent obtained copies of Essex marketing materials. Compl. ¶ 17. These materials included the Black Pieces and "Your Money Matters" publications. *Id.* Essex further alleges that after obtaining these materials, Independent copied and distributed them to their sales representatives for use in selling financial products. *Id.* Young allegedly turned these materials over to Independent knowing that they would be copied and distributed. Compl. ¶ 46.

deterred, however, Essex suggests that the Court rely on Second Circuit case law holding that claims under the New York Stock Exchange ("NYSE") arbitration provision must relate to the business of the NYSE member. *See Haviland v. Goldman, Sachs & Co.*, 947 F.2d 601, 605–6 (2d Cir.1991). But *Haviland* has been limited to situations where a non-NYSE member seeks to compel an NYSE member or associated person to arbitrate a claim rooted in the misconduct of the non-member. *Id.* at 606 n. 1. Here, a NASD associated person, Independent, seeks to compel another NASD associated person, Essex, to arbitrate claims based on the alleged misconduct of Independent. Consequently, the Court declines Essex's invitation to impose a "relatedness" requirement. *See Pearce v. E.F. Hutton Group, Inc.*, 828 F.2d 826, 832 (D.C.Cir.1987) ("relatedness" requirement inapplicable where associated person allegedly engaged in the misconduct).

**9.** These materials will collectively be referred to as "Essex marketing materials."

Claim five asserts that Harrell and Young violated their duty of fidelity by taking confidential business information and property belonging to Essex and delivering them to Independent. Compl. ¶ 52. The property wrongfully delivered to Independent included Essex Black Pieces.

Claim six asserts that Independent received confidential business information by wrongfully inducing Harrell to breach his confidentiality agreement with Essex. Compl. ¶¶ 54–55. This claim is supported in part by the allegation that Independent copied and distributed Essex Black Pieces to its sales representatives under the name "Independent Ideas." Compl. ¶ 55.

Claim seven asserts that Independent received confidential business information by wrongfully inducing and conspiring with Harrell and Young to violate duties of fidelity owed to Essex. Compl. ¶¶ 57–58. Again, part of the information allegedly received, as a result of the wrongful inducement and conspiracy, was obtained from the Essex Black Pieces. Compl. ¶ 58.

Claim eight alleges that Independent falsely represented the origin of certain documents and misrepresented some of the services they provided. Compl. ¶ 60. According to the amended complaint, the false representation occurred when Independent distributed, without authorization, Black Pieces and "Your Money Matters" publications bearing the Essex name and logo. Compl. ¶¶ 17–18.

Claim nine alleges that Independent violated Essex's trademarks and engaged in unfair competition. Compl. ¶ 62. These allegations largely rest on the assertion that Independent illegally altered copies of Essex's "Your Money Matters—Investment Pyramid." Compl. ¶¶ 40, 17–18.

The above claims all directly involved the alleged misappropriation and wrongful use of Essex marketing materials and arise out of or are connected with the business of ENSI. True, Essex owns the copyrights and trademarks to the marketing materials at issue. Yet, there is no dispute that the marketing materials owned by Essex, most notably the Black Pieces and "Your Money Matters—

Investment Pyramid," were created by ENSI. The following words appear on the bottom of these documents: "The information contained herein is prepared for your use by Essex National Securities, Inc., member of NASD–SIPC." Harrell Decl., Ex. A; Compl., Ex. 2.

Certainly, ENSI's creation of Essex marketing materials is a central aspect of ENSI's business. The predominant focus of this business is facilitating the sale of NASD-registered products by Essex employees. That is, ENSI licenses Essex employees to sell these products, monitors compliance by these employees of NASD rules, processes the sales of these employees, and receives a percentage of the sale when consummated. Nicholas Aff. ¶ 6.

Quite obviously, the success of a sales program strongly correlates to a compelling marketing strategy. As explained, ENSI developed the Essex marketing materials which facilitated the sale of NASD-registered products. The seven claims previously described all relate to the misappropriation and wrongful use of these marketing materials by the Defendants. Since the predominant focus of ENSI's business is facilitating the sale of NASD-related products, and the claims under consideration all relate to marketing materials created by ENSI to enhance such sales, I conclude that claims one, two and five through nine all arise out of or are connected with the business of ENSI. *See McMahan*, 35 F.3d at 88 (allegations that defendants purloined integral components of NASD-member's brokerage activities arose out of and were connected with that NASD member's business).

## 2. *Hybrid Program Marketing and Methodology*

The two remaining claims, three and four, substantially relate to the Defendants alleged misappropriation and use of confidential information concerning Essex's hybrid program marketing and methodology (the "hybrid program"). Compl. ¶¶ 48, 50. Determining whether Rule 10101's requirements are satisfied with respect to these claims is a closer question. Nevertheless, this Court cannot say "with positive assur-

ance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute[s]." *Thomas James Associates,* 102 F.3d at 65 (quoting *David L. Threlkeld & Co. v. Metallgesellschaft,* 923 F.2d 245, 250 (2d Cir.), *cert. dismissed,* 501 U.S. 1267, 112 S.Ct. 17, 115 L.Ed.2d 1094 (1991)).

ENSI provides the requisite securities licensing for the salespersons who are the lifeblood of the hybrid program. Nicolas Aff. ¶ 6. Moreover, many of the Essex employees involved in the hybrid program are supervised by ENSI. Nicolas Aff. ¶ 6; Compl. ¶ 15. Unquestionably, without the personnel licensed and supervised by ENSI, Essex's hybrid program could not function. Thus, ENSI's relationship with the hybrid program is significant.

The Plaintiff concedes that "a portion of Essex's business that has been injured has some relation to the business of ENSI." A significant part of Essex's success in the bank insurance and investment industry is due to the hybrid program. Compl. ¶ 15. It follows, therefore, that the misrepresentation and wrongful use of hybrid program information would cause significant harm to Essex, and by extension, ENSI. Consequently, the behavior alleged in claims three and four, if true, adversely impact ENSI's business. Given this causal relationship, and considering the Supreme Court directive that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration," this Court concludes that claims three and four arise out of or are connected with the business of ENSI. *Moses H. Cone,* 460 U.S. at 24–25, 103 S.Ct. at 941.

Accordingly, all nine of the Plaintiff's claims are subject to arbitration. Earlier, the Court concluded that all of the parties were subject to arbitration, since Essex and Independent fell within the definition of an "associated person." Consequently, both of the requirements articulated by NASD Code Rule 10101 are satisfied.

### III. Conclusion

For the foregoing reasons, the Defendants motion to stay these proceedings and compel arbitration pursuant to the Federal Arbitration Act is GRANTED.

**SO ORDERED.**