[No. A121827. First Dist., Div. Five. May 29, 2009.]

VALENTINE CAPITAL ASSET MANAGEMENT, INC., et al., Plaintiffs and Respondents, v.
SEAN AGAHI et al., Defendants and Appellants.

## COUNSEL

Cooke Kobrick & Wu, Christopher Cooke and Jeffrey W. Kobrick for Defendants and Appellants.

Sullwold & Hughes and James A. Hughes for Plaintiffs and Respondents.

**OPINION**

**NEEDHAM, J.**—Sean Agahi, James B. Luippold, and Anthony Ortale (Agahi Defendants) appeal from an order denying their motion to compel arbitration and request for a stay of proceedings. They contend the court erred in (1) ruling that respondent John Valentine's dispute with appellants was not subject to mandatory arbitration under the rules of the Financial Industry Regulatory Authority (FINRA) and (2) refusing to stay proceedings pending arbitration. We will affirm the order.

## I. FACTS AND PROCEDURAL HISTORY

Respondent John Valentine is the founder and president of Valentine Capital Asset Management, Inc. (VCAM), and Valentine Wealth Management, Inc. (VWM). It is alleged that VCAM offers "private portfolio management or institutional-style management to individual investors," including "the benefits of 'the private banking' arrangements enjoyed by institutional investors." VWM allegedly "offers a combination of financial/investment advice, accounting/tax services and estate planning."[1]

VCAM and VWM are investment advisor entities regulated by the Securities and Exchange Commission (SEC). Neither VCAM nor VWM is a member of FINRA, the self-regulatory organization for securities broker-dealers and successor to the National Association of Securities Dealers (NASD).[2] John Valentine is subject to FINRA rules and regulations, not by virtue of his relationship to VCAM or VWM, but through his affiliation with FINRA member Geneos Wealth Management, Inc. (Geneos). It is not alleged that VCAM and VWM are affiliated with Geneos.

Agahi Defendants previously worked for John Valentine's companies, VCAM and VWM. Agahi began working there in 1997, and Luippold joined them in 1998. While they worked together, John Valentine developed business leads and turned them over to Agahi, Luippold and others to follow up, develop a client relationship, and provide services to those clients. In January 2007, Ortale began working for John Valentine's companies as well.

---

[1] We set forth the facts, for purposes of this appeal, based on the allegations of the parties and evidence presented in connection with the motion to compel arbitration. Because of the stage of these proceedings, their truth or falsity has not yet been adjudicated.

[2] In July 2007, FINRA was created through consolidation of the NASD and the member regulation operations of the New York Stock Exchange (NYSE). (*Karsner v. Lothian* (D.C. Cir. 2008) 382 U.S. App.D.C. 275, 278, fn. 1 [532 F.3d 876, 879, fn. 1].)

At the time they worked for John Valentine's companies, Agahi and Luippold, like John Valentine, were registered representatives of Geneos, but it is not alleged that their work for VCAM or VWM required their registration: Agahi initially handled data entry before he became a sales representative, and Luippold was a receptionist, moved to data entry, and also became a sales representative. Ortale was hired as an office manager.

Later in 2007, all of the Agahi Defendants left the Valentine companies and, soon thereafter, became part of a competing firm. Ortale resigned his affiliation with Valentine in May 2007. Agahi's affiliation with Valentine ended in June 2007 and, a few days later, Luippold left Valentine as well. Agahi formed Horizon Wealth Group, LLC (Horizon), and registered it as an investment advisor, in competition with VCAM. Luippold and Ortale joined Agahi at Horizon. Like VCAM and VWM, Horizon is not a member of FINRA. Each of the Agahi Defendants purports to be under the jurisdiction of FINRA, not by virtue of their relationship with Horizon, but as associated persons of FINRA member First Allied Securities, Inc. (First Allied). There is no allegation that Horizon and First Allied are related entities.

After the departure of the Agahi Defendants, John Valentine allegedly discovered that Agahi, while working for the Valentine companies, had e-mailed the client database to Ortale. John Valentine also found that files and e-mails had been deleted from the computer Agahi used at work, and that Agahi was attempting to persuade clients of the Valentine companies to move their assets to Agahi and Horizon.

### A. VCAM and VWM Sue Agahi, Luippold and Ortale

In June 2007, VCAM and VWM sued the Agahi Defendants. The complaint alleged that the Agahi Defendants stole trade secrets from VCAM or VWM, breached their contracts with the Valentine firms by unlawfully soliciting clients, converted their property, made defamatory statements about alleged failure to comply with laws and regulations, and disparaged business and relations with employees. Neither Geneos, First Allied, nor any other FINRA member firm was a party to the action.

Valentine sought a temporary restraining order, which was issued in modified form on July 5, 2007. After some formal discovery, VCAM and VWM filed an application for a preliminary injunction in late August 2007. A preliminary injunction was issued in October 2007.

B. *Valentine Plaintiffs' First Amended Complaint*

Meanwhile, on September 19, 2007, John Valentine joined VCAM and VWM (collectively, Valentine Plaintiffs) as a plaintiff in a first amended complaint. The Valentine Plaintiffs alleged that the Agahi Defendants misappropriated the Valentine Plaintiffs' trade secrets, including their customer list, and made libelous and defamatory statements. Abandoning their contract claims, the Valentine Plaintiffs asserted causes of action for misappropriation of trade secrets, conversion, intentional interference with contractual relations, intentional interference with prospective economic advantage, trade libel, slander, common law unfair competition, statutory unfair competition under Business and Professions Code section 17200, and violation of Penal Code section 502, subdivision (c), against all defendants. Like the original complaint, the first amended complaint did not mention Geneos (the FINRA firm with which John Valentine was associated) or allege wrongdoing by First Allied (the FINRA firm with which the Agahi Defendants were associated).

C. *Agahi Defendants' Answer and Cross-complaint*

The Agahi Defendants answered the first amended complaint on October 19, 2007. As their 20th affirmative defense, they alleged that the Valentine Plaintiffs' claims were barred in the litigation because "plaintiffs" (VCAM, VWM, and John Valentine), as "members" of FINRA, had agreed to submit all disputes to arbitration under FINRA rules.[3]

On the same date, the Agahi Defendants filed a cross-complaint against the Valentine Plaintiffs and two other individuals. The Agahi Defendants alleged they had been independent contractors with VCAM, VWM and predecessor entities, and that by June 2007 their affiliation with VCAM and VWM ended, Agahi formed Horizon, and Luippold and Ortale joined him there. Further, they alleged, in 2002 Agahi entered into a written agreement with John Valentine (signed on behalf of one of Valentine's companies), a copy of which was purportedly attached to the cross-complaint, by which Agahi acquired an ownership interest in John Valentine's investment advisory business (under the name of his business entity) in exchange for Agahi's transfer of his clients to John Valentine and his business entity. Luippold allegedly entered into a similar oral agreement. According to the cross-complaint, the Valentine Plaintiffs breached these contracts. In addition, the Agahi Defendants alleged, the Valentine Plaintiffs slandered them in communications with brokerage firm clients and prospective clients and engaged in

---

[3] The parties do not dispute that this factual allegation was incorrect. VCAM and VWM are not and have never been FINRA members; John Valentine is not a FINRA "member," although he is an "associated person" subject to FINRA arbitration provisions by virtue of his affiliation with FINRA member Geneos.

acts of unfair competition. The Agahi Defendants asserted causes of action for breach of contract, breach of the implied covenant of good faith and fair dealing, common counts, libel and slander, intentional interference with prospective economic advantage, and violation of Business and Professions Code section 17200.

Despite asserting the affirmative defense based on the FINRA arbitration rules, the Agahi Defendants did not at that time move to compel arbitration or seek a stay of the litigation. In fact, more than 10 days after filing their answer and cross-complaint, the Agahi Defendants filed a case management statement that lacked any mention of the dispute being subject to arbitration under FINRA or any arbitration agreement.

The parties proceeded to invest substantial energy and court time in battles over the scope, interpretation, and enforcement of the preliminary injunction. In January 2008, the Valentine Plaintiffs served extensive written discovery upon the Agahi Defendants, noticed their depositions, and issued subpoenas to third parties. The Agahi Defendants' counsel decided it was time to seek arbitration.

### D. *Agahi Defendants' Pursuit of Arbitration and Request for Stay of Proceedings*

On February 21, 2008, some five months after John Valentine had joined the litigation, counsel for the Agahi Defendants asked counsel for the Valentine Plaintiffs to submit the dispute to arbitration under FINRA. The Agahi Defendants claimed that FINRA rules required the arbitration because John Valentine, as well as Agahi and Luippold, were subject to FINRA rules due to their association with FINRA members Geneos and First Allied, neither of which was involved in the dispute. The Valentine Plaintiffs did not agree to arbitrate.

On February 29, 2008, the Agahi Defendants filed a motion to compel arbitration of all claims in the first amended complaint and the Agahi Defendants' cross-complaint, and to stay the trial court proceedings pending completion of the arbitration. The Agahi Defendants reiterated their contention that arbitration under FINRA was required by federal and California arbitration statutes because they and John Valentine were associated persons of FINRA-member firms. (See 9 U.S.C. § 1 et seq. (Federal Arbitration Act) (FAA); Code Civ. Proc., § 1280 et seq. (California Arbitration Act)).

Evidence submitted in connection with the motion indicated that, as mentioned above, at all relevant times John Valentine was a registered representative of FINRA member Geneos, Agahi and Luippold were formerly

registered representatives of Geneos, and all the Agahi Defendants had become registered representatives of FINRA member First Allied. Plaintiffs VCAM and VWM were not members of FINRA.[4]

The Valentine Plaintiffs opposed the Agahi Defendants' motion, contending essentially that the Agahi Defendants had waived their right to arbitrate and that the disputes in the litigation were not subject to FINRA arbitration.

The court's tentative ruling indicated its inclination to deny the motion. The court explained: "FINRA does not apply to this dispute. The dispute does not arise out of the business activities of Valentine, Agahi, Luippold or Ortale as registered representatives of a FINRA member. Geneos and First Allied, the FINRA members, are not parties to this case, and the dispute has nothing to do with the actions or inactions of any of the parties as registered representatives of Geneos or First Allied. The case is limited to the actions of the parties while employed, or following employment, with VCAM and VWM, non-FINRA members. None of these parties are subject to the jurisdiction of FINRA under VCAM or VWM."

A hearing was held on April 29, 2008. On May 19, 2008, the court issued an order adopting its tentative ruling and denying the motion to compel arbitration and the request to stay the proceedings.

The Agahi Defendants filed a notice of appeal from the court's May 19 order on June 3, 2009.[5]

## II. *DISCUSSION*

The Agahi Defendants contend the court erred in denying their motion to compel arbitration and in denying their request for a stay. To resolve the appeal, we need only address the motion to compel.

As to their motion to compel, the Agahi Defendants do not contend arbitration is required based on any agreement they had with John Valentine. Instead, they argue, the disputes must be arbitrated based on an agreement they and John Valentine each had with FINRA to arbitrate certain disputes.

---

[4] The only evidence submitted by the Agahi Defendants in support of their motion to compel arbitration was a declaration from Ortale. The record is missing page four of Ortale's declaration, which the trial court noted it was missing as well.

[5] The denial of a motion to compel arbitration is an appealable order. (See Code Civ. Proc., § 1294, subd. (a); *Mercury Ins. Group v. Superior Court* (1998) 19 Cal.4th 332, 349 [79 Cal.Rptr.2d 308, 965 P.2d 1178].) The order denying the stay is reviewable on appeal from the order denying arbitration. (See Code Civ. Proc., § 1294.2; *Berman v. Renart Sportswear Corp.* (1963) 222 Cal.App.2d 385, 388 [35 Cal.Rptr. 218].)

■ Written arbitration provisions in interstate commercial transactions are enforceable under the FAA.[6] The FAA therefore applies to determine the scope of arbitration provisions in contracts with FINRA-member firms. (See *Baker v. Aubrey* (1989) 216 Cal.App.3d 1259, 1265–1266 [265 Cal.Rptr. 381] [NASD]; *Marciano v. MONY Life Ins. Co.* (E.D.Penn. 2007) 470 F.Supp.2d 518, 525.) ■ Doubts concerning the scope of arbitrable issues must be construed in favor of arbitration, but neither the FAA nor public policy requires parties to arbitrate issues they have not agreed to arbitrate. (*AT&T Technologies v. Communications Workers* (1986) 475 U.S. 643, 648 [89 L.Ed.2d 648, 106 S.Ct. 1415]; *Moses H. Cone Hospital v. Mercury Constr. Corp.* (1983) 460 U.S. 1, 24–25 [74 L.Ed.2d 765, 103 S.Ct. 927].) We review the denial of the motion to compel arbitration de novo. (*County of Contra Costa v. Kaiser Foundation Health Plan, Inc.* (1996) 47 Cal.App.4th 237, 241 [54 Cal.Rptr.2d 628] [interpretation of statute and arbitration agreement]; *Alan v. Superior Court* (2003) 111 Cal.App.4th 217, 223–224 [3 Cal.Rptr.3d 377] [interpretation of arbitration provisions].)

## A. *FINRA and Form U4*

Before engaging in activities as a registered representative for a FINRA-member firm, all registered representatives of broker-dealers, investment advisors, and securities issuers must sign a "Uniform Application for Securities Industry Registration or Transfer," commonly referred to as "Form U4." (See *McManus v. CIBC World Markets Corp.* (2003) 109 Cal.App.4th 76, 88 & fn. 3 [134 Cal.Rptr.2d 446].) The Form U4 is a contract between the regulatory organization (here FINRA) and the individual registrant. (See *Zandford v. Prudential-Bache Sec.* (4th Cir. 1997) 112 F.3d 723, 725.)

Form U4 contains an arbitration provision, which states: "I agree to arbitrate any dispute, claim or controversy that may arise *between me and* my *firm*, or a customer, or *any other person*, that is required to be arbitrated under the rules, constitutions, or by-laws of the *SROs* indicated in Section 4 (SRO REGISTRATION) as may be amended from time to time and that any arbitration award rendered against me may be entered as a judgment in any court of competent *jurisdiction*." (Some italics added.) "SRO" stands for "self-regulatory organization," such as FINRA. Thus, assuming they each signed the required Form U4, John Valentine and each of the Agahi Defendants agreed to arbitrate every dispute required to be arbitrated under FINRA

---

[6] The Agahi Defendants sought arbitration under the authority of both the FAA (9 U.S.C. § 1 et seq.), and the California Arbitration Act (Code Civ. Proc., § 1280 et seq.). They now assert that the resolution of the appeals is governed by the FAA. The parties do not contend there is any material difference in those statutory schemes for purposes of resolving the appeal on this issue.

rules. (See *Marcus v. Masucci* (S.D.N.Y. 2000) 118 F.Supp.2d 453, 456 [signed Form U4 constitutes an express agreement to arbitrate, enforceable under the FAA].)

The relevant FINRA rule provides: "Except as otherwise provided in the Code, a dispute must be arbitrated under the Code if the dispute arises out of the business activities of a member or an associated person and is between or among: [¶] . . . Members; [¶] . . . Members and Associated Persons; or [¶] . . . Associated Persons." (FINRA, rule 13200(a); hereinafter, Rule 13200.) The parties do not contend there is any provision elsewhere in the "Code" that would preclude arbitration of the instant disputes.

Rule 13200, therefore, mandates arbitration of John Valentine's claims against the Agahi Defendants, and their claims against him, if the disputes (1) arise out of the "business activities of a member or an associated person" and (2) are between or among members, members and associated persons, or associated persons. We will address the latter requirement first.

### B. *Dispute Between Associated Persons*

FINRA rule 13100(a) defines an "associated person" as a "person associated with a member," which is in turn defined by FINRA rule 13100(r) to include, as relevant here, a natural person registered under the rules of FINRA. As represented to the trial court, a natural person registers with FINRA by signing and submitting Form U4. If John Valentine and the Agahi Defendants signed Form U4, they would each be associated persons, and the disputes between them would be "between . . . [¶] . . . [¶] [a]ssociated [p]ersons."[7] (Rule 13200.)

As Valentine points out, there was no direct evidence in the trial court of a Form U4 being signed by John Valentine or the Agahi Defendants. The only Form U4 in the record is blank. Neither Agahi nor Luippold submitted a declaration in support of the motion to compel arbitration, and Ortale did not explicitly assert in his declaration that he had signed a Form U4. Accordingly, Valentine urges, the motion to compel arbitration could have been properly denied due to the absence of evidence of signed Form U4's, and on that basis the trial court's ruling may be affirmed.

We disagree. Ortale's declaration averred that John Valentine and each of the Agahi Defendants were registered representatives of a FINRA-member firm, and "[a]ll registered representatives of a FINRA-member firm . . . are

---

[7] The question of whether John Valentine and the Agahi Defendants signed a Form U4 therefore determines both whether they are parties to an enforceable arbitration agreement and, assuming FINRA was an SRO selected on the Form U4, an associated person under FINRA.

required to submit an application to FINRA—called a Form U4—prior to engaging in activities for the firm." From this it can be inferred that John Valentine and the Agahi Defendants signed and submitted Form U4, which included the arbitration provision.

Furthermore, there is no genuine dispute that John Valentine and the Agahi Defendants did, in fact, sign a Form U4 and are, in fact, associated persons within the meaning of FINRA. Attached to Ortale's declaration was a purported printout of Valentine's then current registrations and SRO's, indicating registration with FINRA. Valentine did not dispute the fact of his registration or suggest any way he could have registered without signing Form U4. In his own declaration, he asserted he was "subject to FINRA under [Geneos]." Ortale further declared that he, Agahi, and Luippold were associated persons of a FINRA member, and Valentine did not contend to the contrary. Indeed, Valentine never argued in the trial court that arbitration should be denied because he, Agahi, Luippold, or Ortale had not signed Form U4 or are not associated persons under FINRA.

We will proceed upon the assumption that John Valentine and each of the Agahi Defendants are bound by the arbitration provisions of Form U4 and are "associated persons" for purposes of Rule 13200.

### C. *Arising Out of Business Activities of an Associated Person*

Arbitration of a dispute between associated persons is required under Rule 13200 only "if the dispute arises out of the business activities of a member *or* an associated person . . . ." (Italics added.) FINRA's rules do not define the quoted phrase, but the language, in context, is quite clear.

In the first place, contrary to the Agahi Defendants' suggestion, common sense dictates that the phrase "business activities of . . . an associated person" must have *some* limitation. It certainly cannot include the activities of every possible business enterprise in which an individual, who happens to be an "associated person," might be engaged. There is no indication in Rule 13200, and no extrinsic evidence presented by the parties, suggesting that FINRA intended to bring within the scope of FINRA arbitrations every dispute that an associated person might have in a business he or she pursues on the side, as a freelance photographer, coin collector, novelist, real estate agent, auto mechanic, or the like.

Indeed, a variety of disputes, utterly unrelated to the securities industry, might arise between individuals who happen to be associated persons. For example, a registered representative might also be a real estate agent who sells a home to another person who happens to be a registered representative.

Other registered representatives, engaged in the side business of collecting and selling art, might become embroiled in a dispute over the sale of a painting that one claims to be fake. These disputes would certainly arise out of the parties' business activities, but neither the parties nor FINRA would reasonably expect these private disputes to be appropriate for an arbitration established as part of the regulation of stock brokerage firms. While these types of noninvestment disputes may be relatively unlikely, the construction of Rule 13200 must nonetheless countenance the possibility. Without an appropriate limit on the concept of "business activities," FINRA would be forced to handle disputes outside its purpose and concerns, beyond the expertise of FINRA arbitrators, and beyond the reasonable expectations of the parties involved.

Since there must be some limit to the scope of "business activities" subject to mandatory arbitration under FINRA, we must next find an appropriate means of defining the limitation. We need look no further than the words of Rule 13200 itself. The mandate to arbitrate disputes arising out of "business activities of . . . an associated person," reasonably read, must require arbitration of disputes only if they arise out of the business activities of an individual *as* an associated person of a FINRA member. With this interpretation, FINRA and the registered representatives under its jurisdiction are assured that arbitration will pertain to matters with some nexus to the activity actually regulated by FINRA. This is nothing more than the commonsense meaning of the plain language contained in Rule 13200, and any other interpretation would wrongly strip individuals of their civil jury trial rights concerning subject matter in which FINRA maintains no regulatory interest.

Although the parties have not provided any case law precisely on point, *Paine, Webber, Jackson & Curtis, Inc. v. Chase Manhattan Bank, N.A.* (2d Cir. 1984) 728 F.2d 577 (*Paine Webber*) is somewhat instructive. There, Paine Webber extended credit to a partnership after commissioning a credit check. (*Id.* at p. 578.) The partnership later declared bankruptcy, and Paine Webber sued Chase Manhattan Bank, N.A. (Chase), and a Chase employee for failing to disclose negative credit information when contacted about the partnership's creditworthiness. (*Id.* at pp. 578–579.) The defendants sought a stay of the proceedings pending arbitration of the claim. The district court denied the motion. (*Id.* at p. 579.)

On appeal, the question was whether Chase and its employee, who were not members of the NYSE, could compel Paine Webber, who was a member, to submit its claims to NYSE arbitration. (*Paine Webber, supra,* 728 F.2d at p. 579; see *id.* at p. 580 & fn. 5.) An NYSE provision required arbitration of any dispute between a member and a nonmember " 'arising out of the business of such member.' " (*Id.* at p. 579, fn. 3.) The appellate court

construed this language to mandate arbitration not of all of the member's business, but only of controversies arising out of the member's *"exchange-related* business." (*Id.* at p. 580, italics added.) The court reasoned, among other things, that extending arbitration provisions to controversies not arising out of exchange-related business would "do significant injustice to the reasonable expectations of exchange members" and unjustifiably extend the "congressional mandate of self-regulation under which the exchange adopted these dispute resolution provisions." (*Id.* at pp. 580–581.)

*Paine Webber* differs from this case, because there the dispute was between a member who was bound by the arbitration provision and a nonmember who was not, while here the disputes are between Valentine, an associated person bound by the arbitration provision, and other associated persons also bound by the arbitration provision.[8] Nonetheless, the concerns expressed by the court in *Paine Webber* are shared by us in this case, in the following regard: just as Paine Webber, as a member, should not have to arbitrate claims regarding matters outside its business activities as a member, John Valentine, as an associated person, should not have to arbitrate claims regarding matters outside his business activities as an associated person of a FINRA member.

To similar effect is *Walton v. Lewis* (1999) 337 Ark. 45 [987 S.W.2d 262]. Walton was an associated person of NASD member Llama Company. Walton sued not only Llama Company—but also other defendants who were not NASD members—for conversion and intentional interference with a contractual relationship. The nonmembers contended they were entitled to arbitration under NASD rules. The court disagreed, not because they were nonmembers, but because the dispute did not arise out of Walton's relationship with any NASD member. (987 S.W.2d at pp. 266–267.)

We conclude, therefore, that the disputes between John Valentine and the Agahi Defendants are subject to mandatory arbitration under Rule 13200 only if they arise out of the business activities of John Valentine and/or the Agahi Defendants *as* associated persons of a FINRA member. To resolve this question, we consider the pleadings and evidence before the trial court.

The first amended complaint alleges that the Agahi Defendants misappropriated the Valentine Plaintiffs' trade secrets and made libelous and defamatory statements. The Agahi Defendants' cross-complaint is based upon

---

[8] Indeed, the court limited its holding to instances in which the alleged improper conduct is on the part of the nonmember, and did not decide whether the holding should apply if the wrongdoing was on the part of the member. (*Paine Webber, supra,* 728 F.2d at p. 580 & fn. 5.) We are not extending the holding in *Paine Webber,* but merely noting it for the concerns it illustrates. As demonstrated *ante,* not one of the cases on which the Agahi Defendants rely suggests our interpretation is incorrect.

purported agreements between John Valentine and Agahi and Luippold concerning ownership interests in John Valentine's investment advisory business and their respective rights to certain clients with whom they were involved while working for John Valentine's investment advisory business. It also charges slander and unfair competition. There is no allegation that any of the parties were acting for any FINRA-member firm or as an associated person. No relation is alleged between any FINRA-member firm and the work performed for the Valentine Plaintiffs, the Valentine Plaintiffs' trade secrets, or the Agahi Defendants' alleged use of those trade secrets. The purported contracts at issue in the cross-complaint were not signed on behalf of Geneos or First Allied, and the investment advisory business is alleged to have been in the hands of an entity controlled by John Valentine, not Geneos. None of the purported wrongdoing in either pleading is alleged to have occurred in the course of the parties' duties as associated persons with a FINRA-member firm; instead, it allegedly occurred in connection with investment advisory firms (such as VCAM, VWM, and predecessors, and perhaps Horizon) who are not members of FINRA. The disputes thus relate to John Valentine and the Agahi Defendants, but not to their business activities *as* associated persons of a FINRA member. We therefore must agree with the trial court, based on the record presented to us, that the Agahi Defendants failed to show that the disputes are subject to arbitration under Rule 13200.

The Agahi Defendants insist that the parties' disputes concern their alleged activities as registered representatives of FINRA members Geneos and First Allied. In conclusory terms, they urge in their opening brief that "the gravamen of plaintiffs' claims against defendants are that defendants are 'stealing' Valentine's clients, by getting them to become clients of defendants' new stock brokerage firm, First Allied." That is not, however, what the first amended complaint *alleges*. The first amended complaint alleges that the Agahi Defendants are stealing Valentine's clients for their *own* use. If, in fact, the significance of the Valentine Plaintiffs' allegations is what the Agahi Defendants now claim it to be, they did not explain in the trial court why that is so, or demonstrate to our satisfaction why that inference may be drawn.[9]

---

[9] At oral argument, counsel for the Agahi Defendants claimed that the individual parties in this litigation simultaneously wore "two hats" while performing their work for the Valentine companies—presumably as investment advisors regulated by the SEC and as registered representatives within the purview of FINRA as associated persons. Counsel further suggested that the Valentine firm customers allegedly lured away by the Agahi Defendants would be provided services by the Agahi Defendants within the jurisdiction of FINRA. Neither of these assertions, however, is contained in the pleadings or the evidence presented in support of or in opposition to the motion to compel arbitration. Nor are these assertions reasonable inferences from the record, given the allegations and evidence pointing squarely to a different conclusion. Our ruling is necessarily constrained by the record.

After all, the trial court can base its decision only on the material before it, and those materials circumscribe our review of the trial court's decision as well. The public policy that urges resolution of doubts about arbitrability in favor of arbitration does not absolve parties seeking arbitration from having to establish a basis for reasonably inferring arbitrability.

In the matter before us, there is not a sufficient basis in the record for inferring that the Agahi Defendants' work for the Valentine Plaintiffs or at Horizon is the work of an associated person for Geneos or First Allied. While Agahi and Luippold worked for VCAM when they were registered with Geneos, and the Valentine firms and a Geneos branch purportedly shared an office, there is no contention that the Agahi Defendants performed their duties for the Valentine Plaintiffs *as* associated persons of Geneos, or even that they needed to register with FINRA through Geneos in order to perform their work at VCAM. Nor is there a basis to infer that their alleged use of the Valentine Plaintiffs' trade secrets at Horizon is in their work as an associated person for First Allied.

The Ortale declaration actually suggests a clear distinction between stock brokerage firms (like Geneos and First Allied) who must register with FINRA and whose registered representatives must sign a Form U4, and other types of firms (like VCAM, VWM and Horizon) and their employees who do not fall within FINRA jurisdiction. For example, Ortale avers: "All brokerage firms in the United States are required by law to register with and submit to the jurisdiction of FINRA. VWM and VCAM are wealth advisory firms, not stock brokerage firms, and are not members of FINRA." Similarly, Ortale's declaration makes clear that execution of a Form U4 (the arbitration agreement) and status as an associated person under FINRA (rendering an individual potentially subject to FINRA arbitration) arises when the individual is affiliated with a FINRA *member*.[10] It is further averred in Ortale's declaration and alleged in the Agahi Defendants' cross-complaint that Horizon, for whom the Agahi Defendants now work, is a wealth management business like VCAM and VWM, and an investment advisory firm that is not registered with FINRA.

The record does not clarify the distinction Ortale draws between wealth advisory firms who are not FINRA members and stock brokerage firms who are. It seems to us, however, that if the distinction between wealth advisory firms and stock brokerage firms is sufficient for determining whether an entity

---

[10] Ortale declares: "All registered representatives of a FINRA-member firm (a stock brokerage firm that has submitted to the jurisdiction of FINRA/NASD) are required to submit an application to FINRA—called a Form U-4—prior to engaging in activities for the firm." In addition: "Every securities professional associated with a FINRA member firm . . . must register with FINRA/NASD."

can *be* a FINRA member, the distinction should also be sufficient for determining whether a matter arising out of those respective businesses is or is not subject to FINRA arbitration.[11]

In view of the record in this case, the Agahi Defendants' arguments in their appellate briefs are unconvincing. For example, the Agahi Defendants contend in their opening brief that the Valentine Plaintiffs' first, second, eighth and ninth causes of action for trade secrets misappropriation, conversion, and unfair competition arise from the Agahi Defendants' business activities as registered representatives of First Allied. However, the first amended complaint actually alleges that the Agahi Defendants used the trade secret information for their *"own* benefit" and the *Agahi Defendants* have been unjustly enriched as a result.

The Agahi Defendants next point to the Valentine Plaintiffs' assertion in paragraph 26 of the first amended complaint, alleged on information and belief, that the Agahi Defendants are "operating under the name 'First Allied Securities, Inc.' and have affiliated themselves with a broker/dealer First Allied Securities." This allegation, however, merely set forth the Valentine Plaintiffs' suspicions as to the Agahi Defendants' work status; in fact, the Agahi Defendants have since averred that the company they formed was *Horizon*, not a FINRA member, rather than "First Allied Securities, Inc." Moreover, despite the singular reference to "broker/dealer First Allied Securities," there is no allegation or contention that the Agahi Defendants were acting for or within the scope of their affiliation with First Allied in perpetrating the alleged wrongdoing. To the contrary, as mentioned *ante*, the first amended complaint is based on the proposition that the Agahi Defendants were acting for themselves and for their own benefit.

The Agahi Defendants maintain there is nonetheless a connection with First Allied, because much of their alleged misconduct supposedly occurred after they had become associated persons of First Allied. In addition, they point out, John Valentine testified in deposition that *he* was the owner of the purported trade secret customer list (although in the process of selling it to VCAM and VWM), thus suggesting that the disputes arose out of his business activities. Again, however, the alleged wrongdoing is not purported

---

[11] Although not entirely clear from the parties' filings in the trial court and briefs in this appeal, it appears Ortale may not have been a registered representative or associated person when he worked for the Valentine Plaintiffs. Although he asserts he worked for Geneos while working at VCAM and VWM, he does not aver that he was then an associated person with Geneos or a registered representative. If he was not an associated person, wrongdoing attributed to him during the time he was affiliated with the Valentine companies could not have been performed as an associated person. It would also seem even less likely that John Valentine could be charged with a reasonable expectation that disputes arising with Ortale would be subject to FINRA arbitration.

to have been committed by the Agahi Defendants *as* associated persons of First Allied or any other FINRA member. The Valentine Plaintiffs do not claim that the Agahi Defendants' use of the trade secrets is to the detriment of Geneos or any other FINRA member, or for, in connection with, or to the benefit of First Allied or any other FINRA member.

Next, the Agahi Defendants insist that the first amended complaint is appropriate for FINRA arbitration because some of the claims are based on the securities laws. In particular, they argue that the Valentine Plaintiffs' fifth, sixth and seventh causes of action for trade libel and slander alleged that the Agahi Defendants falsely accused the Valentine Plaintiffs, in communications with clients and a stock brokerage firm, of conduct that violates state and federal securities laws, and that the Valentine Plaintiffs have been falsely accused of using advertising and promotional materials that "failed to comply with state and federal securities laws" or were "in violation of state and federal securities laws."[12] However, the fact that a plaintiff claims a defendant levied false accusations of a securities law violation does not necessarily mean the defendant did so *as* an associated person. The Agahi Defendants do not explain why these references to the securities laws compel FINRA arbitration any more than a reference in a tort case to the commission of a crime would compel a civil action to be transferred to a criminal court.

In a similar vein, the Agahi Defendants argue in their reply brief that the disputes contain legal or factual issues the securities industry might find important, because the claims involve the rules or practices of the securities industry, its customers, or the conduct of its members in transactions with customers. There are, however, two problems with this argument. First, the Agahi Defendants did not advance the argument, at least to any meaningful degree, in the trial court. Second, neither the pleadings nor the evidence before the trial court supports their assertions. John Valentine's legal theories of liability in the first amended complaint are not based on any NASD or FINRA rule. Although the Agahi Defendants allege in their cross-complaint that John Valentine was responsible for false and defamatory statements made *to* the NASD or FINRA, they do not allege that liability for those statements

---

[12] A closer look at these allegations confirms that the harm is alleged to have been incurred by the Valentine Plaintiffs, not a FINRA-member firm. The fifth cause of action for trade libel alleges that the Agahi Defendants made defamatory statements "*about the Valentine companies* by calling or writing clients and potential clients *of the Valentine companies*, . . . falsely alleging problems *of the Valentine companies* with asset retention, employee retention, and violations of state and federal law." (Italics added.) The sixth cause of action alleges that Agahi and Luippold slandered the Valentine Plaintiffs by making "false statements *concerning John Valentine and the Valentine companies*" in the presence of "clients and prospective clients *of the Valentine companies*." (Italics added.) The seventh cause of action alleges that Ortale slandered the *Valentine Plaintiffs* by saying, among other things, that the Valentine Plaintiffs were using advertising and promotional material that were in violation of state and federal securities laws.

is premised on any FINRA rule or regulation. Nor is there any such contention found in the evidence the Agahi Defendants submitted in support of their motion. Accordingly, the cases cited by the Agahi Defendants on this point are distinguishable. (E.g., *Spear, Leeds & Kellogg v. Central Life Assur. Co.* (2d Cir. 1996) 85 F.3d 21, 29–30 [dispute was arbitrable as exchange-related where NYSE-member firm was charged with wrongdoing based in part on NYSE rules, and NYSE-member firm entered into a consent agreement with the NYSE]; *Fleck v. E.F. Hutton Group, Inc.* (2d Cir. 1989) 891 F.2d 1047, 1053 [former employee's claims were arbitrable to the extent they related to his performance as a broker and associated person for NYSE member].)

Turning to their cross-complaint, the Agahi Defendants refer us to the allegations of their fifth cause of action, in which they assert that the Valentine Plaintiffs made false and defamatory comments about them to clients, and in regulatory filings with FINRA, after they left the Valentine companies. Among other things, the Valentine Plaintiffs purportedly caused Geneos to send letters dated June 28, 2007, to clients, informing them: "A former registered representative of Geneos Wealth Management and a former employee of Valentine Wealth Management Inc. appear to have taken information relating to your investment account(s) including you[r] address, phone number, social security number and account number" and "[t]o protect yourself from the possibility of identity theft we recommend that you place a fraud alert on your credit files." It was also alleged that John Valentine provided false information to former clients of Agahi and Geneos that blamed Agahi for mistakes in client accounts, in order to prompt the clients to complain to FINRA and Geneos about Agahi and thereby tarnish his record on file with FINRA.

The arbitrability of this fifth cause of action of the cross-complaint is a much closer question, because the allegations involve the attempts of one associated person to impugn the integrity of another associated person, using correspondence from a FINRA-member firm, with ramifications for an associated person's record on file with FINRA. It also suggests some relationship between VWM and Geneos. In the end, however, the alleged wrongdoing does not arise out of John Valentine's activities *as* an associated person of Geneos, and it does not reflect a battle over the clients of FINRA members, but over the clients of John Valentine's investment advisory business. In particular, the statement contained in Geneos's letter apparently related to

John Valentine's business activities, not the business activities of Geneos, and the Agahi Defendants did not name Geneos as a defendant or contend it was in some way liable.[13]

The cases on which the Agahi Defendants rely do not help their case. While it is true that FINRA (or NASD or NYSE) arbitration has been held applicable to many different causes of action, including claims for trade secret misappropriation, defamation, and unfair competition waged between firms and their former employees, there appears in those cases a nexus between the alleged wrongdoing and the actions of a party *as* a member or associated person.

For example, the Agahi Defendants rely on *McMahan Sec. Co. L.P. v. Forum Capital Markets, L.P.* (2d Cir. 1994) 35 F.3d 82 (*McMahan*). In *McMahan*, an NASD-member securities firm and some of its partners alleged misappropriation of its trade secrets by ex-employees who formed a competing NASD-member securities firm. (*Id.* at pp. 84–85.) The court held that the causes of action were arbitrable, because they arose in connection with the business of the NASD-member firm and the activities of associated persons. (*Id.* at p. 88.) Here, by contrast, the claims are that the Agahi Defendants misappropriated trade secrets belonging to someone other than a FINRA-member firm, for use with someone other than a FINRA-member firm.

In *Marcus v. Masucci, supra,* 118 F.Supp.2d 453, plaintiff Marcus was an associated person of an NASD-member firm. He sued defendant Masucci, who was formerly an associated person of the same NASD-member firm, for trade secret misappropriation and unfair competition arising from his misappropriation of an investment product and use of it while employed by a competing NASD-member firm. (*Id.* at p. 456.) Indeed, it was specifically alleged that Masucci collaborated with his new NASD-member firm to misappropriate the trade secrets and develop and market competing products. (*Id.* at pp. 454–456.) The court ordered arbitration of the claims; the wrongdoing was clearly in connection with Masucci's work *as* an associated person. (*Id.* at p. 458.)

---

[13] We note that the Agahi Defendants asserted the fifth cause of action against VCAM, VWM, and two other individuals, as well as John Valentine. The Agahi Defendants do not establish how parties other than John Valentine and the Agahi Defendants could be compelled to arbitrate the claim. Nor do they establish that the litigation on the six other causes of action in their cross-complaint, as well as all the causes of action in the first amended complaint, should be stayed as to all parties pending the arbitration of just one of the claims between only some of the parties. If we were to remand on the basis of the fifth cause of action in the cross-complaint, the trial court would have to consider these issues, along with the Valentine Plaintiffs' contention that the Agahi Defendants waived their right to arbitrate. We need not discuss these matters further, however, since we conclude that even the fifth cause of action of the cross-complaint is not subject to mandatory FINRA arbitration.

In *Essex Corp. v. Independent Financial Marketing Group* (S.D.N.Y. 1998) 994 F.Supp. 532 (*Essex*), the defendants included former employees of the plaintiff. To fulfill their job duties with the plaintiff, they had been required to be licensed and registered with a member of the NASD. (*Id.* at p. 534.) Because their employer was not a NASD member, they registered through their employer's subsidiary, and, as registered representatives, they signed Form U4. (*Id.* at pp. 533–534.) After they left the plaintiff's employ, they became registered under their new NASD-member firm. (*Ibid.*) The plaintiff sued its former employees and their new firm for copyright violations, trademark infringement, breach of fiduciary duty, breach of a confidentiality agreement, and unfair competition. (*Id.* at pp. 533, 536–538.) The court ruled the claims were subject to FINRA arbitration, because the plaintiff employer and the ex-employee defendants were associated persons, and the claims arose out of or were connected to the business of the NASD member through whom they were registered while in the plaintiff's employ. (*Id.* at pp. 537–538.) In other words, the claims were related to the work of the individual defendants *as* associated persons.[14]

In *American Express Financial Advisors, Inc. v. Zito* (E.D.N.Y. 1999) 45 F.Supp.2d 230, an NASD-member firm sued its ex-employee, alleging misappropriation of the member firm's confidential and proprietary information about the member firm's clients, and use of the information to the member firm's detriment. (*Id.* at pp. 231–234.) As the Agahi Defendants emphasize, the court ruled: "It is difficult to imagine any set of facts that could come closer to the facts herein in describing a dispute that arises out of the business of a member in connection with an associated person." (*Id.* at p. 234.) But this was because the claim arose from the employee's employment with the NASD-member firm and, thus, his work *as* an associated person of a member.

*Fleck v. E.F. Hutton Group, Inc., supra,* 891 F.2d 1047, involved an action by Fleck, an associated person, against his former employer (identified both as a firm that was an NYSE member and a firm that was not an NYSE member). (*Id.* at pp. 1048–1049.) Fleck alleged that his former employer(s) defamed him to firm clients with allegations of wrongful conduct in handling client accounts for the firm. (*Id.* at pp. 1052–1053.) The court held that the claims were subject to arbitration, as arising in connection with business or with activity as an associated person, to the extent the claims involved

---

[14] The court in *Essex* ruled that the claims did not have to pertain to *NASD-related* business of the NASD member, at least where an associated person seeks to compel arbitration on another associated person's claims. (*Essex, supra,* 994 F.Supp. at p. 536, fn. 8, citing *Pearce v. E.F. Hutton Group, Inc.* (D.C. Cir. 1987) 828 F.2d 826, 830 [264 U.S. App.D.C. 246].) We do not hold that the claims must pertain to the member's *FINRA-related* business, but that the claims must pertain to the associated person's role with a FINRA member—in line with *Essex, Pearce,* and the other cases we address.

significant aspects of the employment relationship that depended on an evaluation of Fleck's performance as a broker (and, in those circumstances, as an associated person). (*Id.* at p. 1049.) Arbitrability was thus based on a nexus between the dispute and the associated person's activities *as* an associated person employed by a member firm.

In *Pearce v. E.F. Hutton Group, Inc., supra,* 828 F.2d 826, Pearce was a registered representative employed by an NYSE member as a branch office manager. (*Id.* at p. 827.) An affiliate of the NYSE member publicly identified Pearce as one of the persons responsible for the NYSE member's pleading guilty to mail and wire fraud. (*Ibid.*) Pearce sued the affiliate (and an individual) for defamation and invasion of privacy. (*Ibid.*) The affiliate sought a stay pending arbitration under NYSE rules, which the district court denied. (*Id.* at p. 828.) On appeal, the court ruled that Pearce's claims arose in connection with his activities as an associated person and concluded that any " '[e]xchange relatedness' " requirement included the cash management practices of a branch office manager as well as activities involving customer accounts or to broker-dealer functions. (*Id.* at pp. 830–832.) Thus, the claim arose out of the plaintiff's activities as a branch manager for the NYSE member, and therefore *as* an associated person of that member.

None of the cases on which the Agahi Defendants rely involved a situation in which an associated person sued another associated person due to activities unrelated to a member firm or unrelated to business regulated by the NASD, NYSE, or FINRA. (See also *Zolezzi v. Dean Witter Reynolds, Inc.* (9th Cir. 1986) 789 F.2d 1447, 1450–1451 [stockbroker's action for defamation against former employer, a member of NYSE, alleging the firm made false statements about his conduct as a broker while in the employ of the brokerage firm].)

The cases on which the Agahi Defendants rely in their reply brief are no more compelling, but they warrant a bit more discussion. In *Williams v. Imhoff* (10th Cir. 2000) 203 F.3d 758 (*Williams*), the plaintiffs were former employees of defendant corporation, an NASD member, and each of the plaintiffs had signed a Form U4. (*Id.* at p. 760.) After their employment was terminated, the plaintiffs sued the defendant corporation and certain individuals, alleging they did not receive proper valuation for stock held in the corporation's profit-sharing plan. They asserted claims for breach of fiduciary duty, conspiracy, and breach of fiduciary duties under the Employee Retirement Income Security Act of 1974 (ERISA; 29 U.S.C. §§ 1001–1461). (*Williams,* at p. 762.) The individual defendants moved to compel arbitration based on the Form U4's signed by the plaintiffs. (*Ibid.*) The district court granted the defendants' motion with respect to the plaintiffs' first and second claim for

relief, but not as to the ERISA claims. (*Williams*, at p. 762.) The Court of Appeal reversed, holding that the ERISA claims were subject to arbitration as well. (*Williams*, at p. 767.)

The appellate court observed that, to be subject to the NASD arbitration rules, the ERISA claims had to be between persons specifically listed in the NASD rule and " 'arise in connection with the business' " of members, " 'in connection with the activities of such associated person(s),' " or " 'out of the employment or termination of employment of such associated person(s) with such member.' " (*Williams, supra*, 203 F.3d at p. 764.) The court found that the ERISA claims were between "associated persons," since the plaintiffs were employees involved in the sale of securities and the defendants were directors or officers of the corporation. (*Williams*, at pp. 764–765.) The court further ruled that the ERISA claims were arbitrable because they arose out of the plaintiffs' employment or termination from employment; in other words, they had a connection with the NASD member and with the activities of the plaintiffs and the defendants in their respective work for the NASD member. (*Williams*, at p. 766.)

*Williams* is consistent with our holding. While the court in *Williams* found the ERISA claims were between associated persons even though the defendants were sued in their capacity as ERISA fiduciaries, we similarly conclude that John Valentine and the Agahi Defendants are associated persons, regardless of the capacity in which they sued or were sued. While the ERISA claims in *Williams* were subject to arbitration because they arose out of the parties' employment with an NASD member, here the claims are not subject to arbitration because they have no alleged relationship to the parties' association with a FINRA member. (See also *Williams, supra*, 203 F.3d at p. 767 [noting that the ERISA claims were *not* in connection with the NASD member's business, which was the selling of securities].)

In *Beer v. Nutt* (S.D.N.Y. 2007) 2007 U.S. Dist. Lexis 13 (*Beer*), Beer persuaded Nutt to invest in Fiesta Partners Fund, LLC (Fiesta). Nutt discovered the investment was a sham and filed an NASD arbitration claim against Beer and Fiesta's managing member, Pinnacle, asserting numerous claims, including breach of NASD rules and violations of a state securities act. Although Pinnacle was an NASD member and Beer was an associated person of Pinnacle, they argued that Nutt's claims were not subject to NASD arbitration because Beer did not write misleading correspondence to Nutt in his capacity as a Pinnacle employee. The court found the argument unpersuasive: "I have found nothing in the Code or in the case law that requires the dispute to have arisen in connection with the activities of the associated person acting as an agent or representative of the member organization." (*Beer*, at p. *10.)

As an unpublished decision of a federal district court in New York, *Beer* is not binding on this court. (E.g., *DeJung v. Superior Court* (2008) 169 Cal.App.4th 533, 548, fn. 9 [87 Cal.Rptr.3d 99].) Nor do we find it persuasive, for several reasons. First, the case pertained to a dispute with a customer, the arbitration of which would fall under a different FINRA rule, *not* Rule 13200. A broader scope of arbitrability may well be appropriate for customer disputes—a determination we need not and do not reach here. Second, the court's statement in *Beer* is less of an analysis of FINRA arbitration provisions than the judge's candid observation that he had not found any rule or law on point. Third, *Beer* is distinguishable because liability was based on violations of NASD rules and the state securities act. Fourth, *Beer* is not contrary to our holding. We do not hold that no dispute can ever be arbitrated unless the associated person engaged in wrongdoing as an agent or representative of a FINRA member; we hold merely that the dispute must arise out of the business activities of a party as an associated person. Given the record in this case, the Agahi Defendants failed to make that showing.

██ We are of course mindful of the policy under federal and California law favoring the arbitration of disputes. As mentioned, however, that policy cannot be used to compel arbitration of disputes that are plainly outside the scope of the arbitration agreement. (See, e.g., *AT&T Technologies v. Communications Workers, supra*, 475 U.S. at p. 648.) Nor does it relieve the Agahi Defendants of the burden to point to something in the pleadings or admissible evidence from which we might infer that the work they allegedly performed, the trade secrets they allegedly misappropriated, the use to which they allegedly put those trade secrets, or the parties' alleged defamation of each other, arises out of a party's activities *as* an associated person of a FINRA member. Based on the record in this appeal, the claims in the first amended complaint and the cross-complaint are not subject to arbitration under Rule 13200.[15]

Because the Agahi Defendants fail to establish error in the trial court's denial of their motion to compel arbitration, they cannot establish error in the court's denial of their request for a stay of the trial court proceedings.

---

[15] The Valentine Plaintiffs further contend that the Agahi Defendants waived any right they might have had to arbitration by, e.g., acting in a manner inconsistent with arbitration, pursuing litigation, and delaying their request for a stay. Because the trial court was correct in concluding the dispute was not subject to arbitration, we need not address the waiver issue. Nor need we address the parties' arguments as to the application of Code of Civil Procedure section 1281.2, subdivision (c), which pertains only if some of the claims must be arbitrated.

### III.   *DISPOSITION*

The order is affirmed.

Jones, P. J., and Simons, J., concurred.

A petition for a rehearing was denied June 29, 2009, and appellants' petition for review by the Supreme Court was denied September 7, 2009, S174477.